# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

*Petitioner-Appellee,*

v.

WASHINGTON SUBURBAN SANITARY
COMMISSION,

*Respondent-Appellant.*

No. 09-2263

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(8:09-cv-00825-AW)

Argued: December 8, 2010

Decided: January 26, 2011

Before WILKINSON and NIEMEYER, Circuit Judges,
and Patrick Michael DUFFY, Senior United States District
Judge for the District of South Carolina,
sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Niemeyer and Senior Judge Duffy
joined.

**COUNSEL**

**ARGUED**: Todd James Horn, VENABLE, LLP, Baltimore, Maryland, for Appellant. Susan Ruth Oxford, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellee. **ON BRIEF:** George W. Johnston, VENABLE, LLP, Baltimore, Maryland, for Appellant. P. David Lopez, General Counsel, Carolyn L. Wheeler, Acting Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

The Washington Suburban Sanitary Commission ("WSSC"), a public utility, restructured its Information Technology ("IT") Department by eliminating essentially all of its merit-system positions and replacing them with reorganized, non-merit-system ones. Some of the displaced employees filed an age discrimination complaint with the Equal Employment Opportunity Commission, alleging that WSSC conducted the restructuring in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*

The EEOC subpoenaed WSSC for records related to the restructuring and to the IT Department's training practices, employment policies, and discrimination history. WSSC declined to comply: it argued that legislative immunity and privilege shielded the materials because the restructuring was partially accomplished through county budget processes. After the EEOC dropped certain portions of its request, the district court ordered WSSC to comply with the remainder of the subpoena.

WSSC now appeals that order, again pressing its claim to legislative immunity and privilege. We recognize the great importance of protecting legislators from intrusive and costly inquiries into their legislative acts. But we decline to intervene in the EEOC's investigation at this time. It is simply too early to tell whether the investigation will ever involve the application of coercive process against legislators and accordingly premature to address speculative claims of legislative privilege. The order of the district court is therefore affirmed.

## I.

### A.

WSSC is a bi-county governmental body providing water and sewer services to most of Prince George's and Montgomery Counties in Maryland. *See generally* Md. Code Ann. art. 29, § 1-101 *et seq.*; *Katz v. WSSC*, 397 A.2d 1027, 1032 (Md. 1979) (characterizing WSSC as a state agency for sovereign immunity purposes).[1] It is led by six commissioners, and each county selects three of the six. In 2005 WSSC hired a new General Manager, Andrew Brunhart, and a new Chief Information Officer, Goutam Kundu. Kundu was in charge of WSSC's IT Department. Late that year Kundu conducted an assessment of the IT Department and concluded that it needed to be restructured, with essentially all of its current, merit-system positions eliminated and replaced with newly created, non-merit ones. WSSC contends that eliminating the old positions in favor of new, non-merit ones allowed WSSC to offer higher salaries, thereby attracting more highly skilled employees and alleviating the problems that Kundu found to be affecting the IT Department.

---

[1]The applicable provisions of Maryland law have been revised and relocated since the events in question, but without relevant substantive change. *See generally* Md. Code Ann., Pub. Utils. § 16-101 *et seq.* (LexisNexis 2010).

The proposed changes required an increase to the IT Department's proposed Fiscal Year ("FY") 2007 budget. General Manager Brunhart forwarded the changes, along with the rest of the proposed WSSC budget, to the WSSC Commissioners. The Commissioners met to discuss the budget, and they reviewed details regarding the proposed IT reorganization. The Commissioners voted to send the preliminary budget, including the changes stemming from the restructuring, to a public hearing. In February 2006 Kundu made another presentation to the Commissioners regarding the reorganization, and they voted in favor of the proposal. Shortly thereafter, they unanimously approved the FY 2007 budget at a public meeting, sending the proposed budget on to the county executives.

Maryland law required the county councils to review WSSC's budget and gave the councils authority to "add to, delete from, increase, or decrease [a budget] item." Md. Code Ann. art. 29, § 1-204(c)(1)(ii). Accordingly, WSSC also had discussions with the councils about the proposed restructuring. County participants at a budget session asked for details about financial aspects of the restructuring, and WSSC provided the county executives and county council members information about the restructuring's purpose and impact. Both county councils addressed, to some degree, the proposed restructuring. A subcommittee of the Prince George's County Council devoted a meeting to the topic, with some members expressing concerns about the impact on current employees. The full council, however, completed its review of WSSC's proposed budget, including the IT Department restructuring, without recommending any changes.

Similarly, a subcommittee of the Montgomery County Council received a report that contained an analysis of the budget's impact on employment. After a hearing at which one council member expressed some concerns about the restructuring, the subcommittee as a whole made no recommenda-

tion either way.[2] The entire Montgomery County Council then met, with some members again voicing concerns about eliminating the merit positions. However, the council ultimately sent budget recommendations to Prince George's County that made no mention of the restructuring or of its accompanying IT Department funding increase.

The two counties met to resolve unrelated disagreements regarding the FY 2007 budget. After the counties failed at this effort, however, the proposed budget became final by operation of law. Before implementing the restructuring, WSSC notified current employees of the plan, encouraged them to apply for positions in the restructured department, and provided them with transitional support. On July 21, 2006—after all the new positions had been filled—current employees who were not offered post-restructuring jobs were told that August 6 would be their last day on the job.

## B.

Not everyone was happy about the restructuring. In October 2006, Colleen Bowen and fifteen other former employees filed suit in Maryland state court against WSSC, the WSSC Commissioners, Brunhart, and Kundu. Plaintiffs alleged that the restructuring violated Maryland law and WSSC's own policies regarding merit system positions, that it violated the plaintiffs' due process rights, and that it impermissibly discriminated against them on the basis of their age. In December 2006, Bowen and fourteen others also filed age discrimination charges against WSSC with the EEOC. They

---

[2]Some were concerned that WSSC lacked authority to eliminate the merit positions. WSSC requested advice from the Maryland Attorney General's Office on this question and was informed that under Md. Code Ann. art. 29, § 11-103, it could eliminate the merit positions so long as it had a bona fide reason to do so. WSSC also received permission to eliminate the merit positions from the Secretary of the Maryland Department of Budget and Management, the only official whose authorization was necessary for WSSC to eliminate the positions.

alleged that WSSC discriminated against them in training decisions made prior to the restructuring, that the restructuring was actually motivated by a desire to eliminate the older workers and to avoid paying their approaching retirement benefits, and that WSSC discriminatorily hired undertrained younger workers to fill the new positions.

WSSC responded to the state and federal proceedings by asserting legislative immunity and legislative privilege. The state trial court dismissed without prejudice WSSC's contentions, and in September 2007 the Maryland Court of Special Appeals rejected WSSC's appeal on the grounds that the ruling was not a final judgment. The Maryland Court of Appeals granted WSSC's petition for certiorari, but in the meantime the EEOC requested additional information from WSSC and, in May 2008, subpoenaed it. In April 2009 the EEOC sought to enforce the subpoena in federal district court, though the proceedings were stayed pending the Maryland Court of Appeals's decision. That court ultimately decided that it could not hear WSSC's interlocutory appeal, *see WSSC v. Bowen*, 978 A.2d 678, 683–87 (Md. 2009), leaving the district court to adjudicate whether WSSC had to comply with the EEOC's subpoena.

The subpoena requested a broad range of documents, summarized here:

- Kundu's employee file, as well as the complainants' files, the files of former IT employees who applied for post-restructuring positions, and the files of those who made post-restructuring employment decisions for WSSC.

- Analyses and standards WSSC used in deciding to abolish the existing positions, along with records of internal deliberations about that decision.

- Tests WSSC used in making employment decisions since 2005, as well as any criteria used in making hiring decisions during and after the restructuring.

- The names of everyone employed by WSSC since 2005, everyone terminated because of the restructuring, everyone who applied for post-restructuring positions, everyone hired for such positions, everyone responsible for making post-restructuring hiring decisions, and every former employee who was rehired after the restructuring.

- Advertisements used during and after the restructuring to advertise for IT Department positions.

- Documents related to training opportunities provided to IT Department employees since 2005.

- Job descriptions and requirements for IT Department positions since 2005, as well as the applications submitted for post-restructuring positions.

- Records of all IT Department hires, promotions, discipline, and voluntary separations since 2005, along with records of any allegation of age discrimination or retaliation lodged against WSSC and of the WSSC's formal and informal employee policies.

During the district court proceedings, however, the EEOC modified its request, dropping the items demanding records of internal deliberations regarding the restructuring and of the analyses and standards used in deciding whether to restructure. The district court ruled that while legislative privilege might in theory defeat the EEOC's subpoena power, the EEOC's modified subpoena asked for information about discrimination prior to and after the legislative restructuring

decision, not for information about the decision to restructure itself. It therefore ordered WSSC to comply. WSSC appeals that decision.

## II.

Congress explicitly subjected "political subdivision[s] of a State and any agency or instrumentality of a State or a political subdivision of a State" to the Age Discrimination in Employment Act's (ADEA) antidiscrimination requirements. 29 U.S.C. § 630(b). Although the ADEA does not abrogate state sovereign immunity from private damages suits, *see Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 91 (2000), the EEOC retains authority to enforce the ADEA's provisions by suing on its own, *see S.C. State Ports Auth. v. Fed. Mar. Comm'n*, 243 F.3d 165, 176 (4th Cir. 2001) (stating that the EEOC "can bring an action against a state under the ADEA even though a private individual cannot do so").

Congress also granted the EEOC authority to "make investigations and require the keeping of records necessary or appropriate for the administration of" the ADEA. 29 U.S.C. § 626(a). Along with this grant of investigative authority, Congress gave the EEOC commensurate authority to subpoena information and gave district courts jurisdiction to enforce those subpoenas. *See id.* (incorporating the subpoena and enforcement powers found within 15 U.S.C. § 49). In the ADEA context, the EEOC's investigatory powers do not turn on the particulars of a complainant's charge; "the EEOC [has] authority to investigate and enforce" independent of any ADEA charge brought by aggrieved employees. *EEOC v. Am. & Efird Mills, Inc.*, 964 F.2d 300, 304 (4th Cir. 1992).

However, the EEOC's subpoena authority has its limits. In order for a district court to enforce an administrative subpoena, the EEOC must show that "(1) it is authorized to make such investigation; (2) it has complied with statutory requirements of due process; and (3) the materials requested are rele-

vant." *EEOC v. Lockheed Martin Corp., Aero & Naval Sys.*, 116 F.3d 110, 113 (4th Cir. 1997) (quoting *EEOC v. City of Norfolk Police Dep't*, 45 F.3d 80, 82 (4th Cir. 1995)). Moreover, administrative subpoenas must not be "excessive or unduly burdensome." *Am. & Efird Mills*, 964 F.2d at 303.

The EEOC's subpoena power is also constrained by evidentiary privileges. In *University of Pennsylvania v. EEOC*, 493 U.S. 182, 195 (1990), the Court recognized this fact; it rejected the University's request for a peer review materials privilege but spoke approvingly of other cases recognizing evidentiary privileges that had "constitutional foundation[s]." The circuit courts have agreed, refusing to enforce administrative subpoenas where the agency's request would trample on recognized privileges and upholding them where it would not. *See, e.g.*, *U.S. Dep't of Educ. v. Nat'l Collegiate Athletic Ass'n*, 481 F.3d 936, 938 (7th Cir. 2007) (rejecting an internal investigations privilege but noting that "there are privileges that can be used to keep information from government agencies"); *EEOC v. Lutheran Soc. Servs.*, 186 F.3d 959, 969 (D.C. Cir. 1999) (dismissing an EEOC subpoena enforcement action where the subpoena sought information protected by the work product privilege).

Legislative privilege clearly falls within the category of accepted evidentiary privileges. *See, e.g.*, *Burtnick v. McLean*, 76 F.3d 611, 613 (4th Cir. 1996) (recognizing legislative privilege in Title VII, ADEA, and § 1983 actions). To understand why the privilege is so well accepted, it is necessary to take a step back and examine the parallel concept of legislative immunity. Our legal system has broadly recognized the right "of legislators to be free from arrest or civil process for what they do or say in legislative proceedings." *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951); *see generally Whitener v. McWatters*, 112 F.3d 740, 743–44 (4th Cir. 1997) (tracing the history of legislative immunity).

The Speech or Debate Clause provides such immunity from suit to federal legislators. *See* U.S. Const. art. I, § 6, cl. 1. In

recognition of the immunity's historical pedigree and practical importance the Supreme Court has extended it to a wide range of legislative actors. *See Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998) (local legislators); *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 402–06 (1979) (regional legislators); *Tenney*, 341 U.S. at 372–76 (state legislators). It applies even where the legislative body to which the individual legislator belongs lacks immunity for its legislative acts, *compare Owen v. City of Independence*, 445 U.S. 622, 657 (1980) (municipalities do not enjoy immunity under § 1983), *with Bogan*, 523 U.S. at 49 (municipal legislators do), and it covers all those properly acting in a legislative capacity, not just actual officeholders, *see Supreme Court of Va. v. Consumers Union of the U.S.*, 446 U.S. 719, 731–34 (1980).

Legislative immunity's practical import is difficult to overstate. As members of the most representative branch, legislators bear significant responsibility for many of our toughest decisions, from the content of the laws that will shape our society to the size, structure, and staffing of the executive and administrative bodies carrying them out. Legislative immunity provides legislators with the breathing room necessary to make these choices in the public's interest, in a way "[un]inhibited by judicial interference [and] [un]distorted by the fear of personal liability." *Bogan*, 523 U.S. at 52. It allows them to focus on their public duties by removing the costs and distractions attending lawsuits. It shields them from political wars of attrition in which their opponents try to defeat them through litigation rather than at the ballot box. And it increases the caliber of our elected officials by preventing the "threat of liability [from] significantly deter[ring] service," particularly in "local government, where prestige and pecuniary rewards may pale in comparison to the threat of civil liability." *Id.* Legislative immunity thus reinforces representative democracy, fostering public decisionmaking by public servants for the right reasons.

Legislative privilege against compulsory evidentiary process exists to safeguard this legislative immunity and to further encourage the republican values it promotes. *See Burtnick*, 76 F.3d at 613. "Absolute immunity enables legislators to be free, not only from 'the consequences of litigation's results, *but also from the burden of defending themselves.*'" *Id.* (quoting *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967)) (emphasis added). Because litigation's costs do not fall on named parties alone, this privilege applies whether or not the legislators themselves have been sued. *See id.*; *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 859 (D.C. Cir. 1988) ("A litigant does not have to name members or their staffs as parties to a suit in order to distract them from their legislative work. Discovery procedures can prove just as intrusive."). Consequently, if the EEOC or private plaintiffs sought to compel information from legislative actors about their legislative activities, they would not need to comply. *See Burtnick*, 76 F.3d at 613 (noting that the plaintiff would have to make a prima facie ADEA case without testimony from city council members unless they waived the privilege).

## III.

WSSC does not challenge the subpoenaed items' relevance, the EEOC's process in issuing the subpoena, or the burdens WSSC would face in complying with it. We thus have no occasion to consider these questions. Instead, WSSC insists that the subpoena trenches upon legislative immunity and legislative privilege. It contends that the EEOC seeks to learn whether age bias motivated WSSC's decision to restructure the IT Department, a topic which it argues will impermissibly require testimony from the WSSC Commissioners and county council members. WSSC also argues that because the restructuring decision inherently involved the employees whose positions were abolished and decisions about how and whom to hire after the restructuring, the modified subpoena cannot be carved up into acceptable time periods that will not require legislative testimony. While we agree wholeheartedly with

WSSC about the importance of legislative immunity and privilege, we do not believe the EEOC's modified subpoena threatens them at the present time.

A.

We note at the outset that these proceedings are at a very preliminary stage. The EEOC is not bringing suit against WSSC for ADEA violations; it is merely investigating possible age discrimination at WSSC. Moreover, the EEOC is only in the early stages of that investigation. At this point, it is simply unknown whether the EEOC's investigation will ripen into a lawsuit against WSSC and, if so, whether either side in that so–far-nonexistent lawsuit will seek coercive process against legislative officials to make its case.

What we do know, however, is that none of the county council members or the WSSC Commissioners has been subpoenaed to testify, and we have as yet no reason to believe that WSSC's production of the requested materials will require that legislative officials divert their time and attention away from their legislative duties. It would be premature to refuse to enforce the modified subpoena now because a legitimate claim of privilege might ripen at some point down the road.

WSSC contends that we need not wait around to learn whether the EEOC will seek information regarding legislators' motives and whether WSSC will need legislative testimony to defend itself. It argues that the EEOC's own statements, along with the complainants' charges, demonstrate the EEOC's intent to inquire after WSSC's motive in restructuring the IT department. Moreover, WSSC insists the ADEA's proof framework will require it to seek legislators' testimony. Age discrimination plaintiffs must prove that "age was the 'but-for' cause of the employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2351 (2009). Thus to defend itself against the complainants' allegations

that the restructuring was motivated by age, WSSC will eventually need testimony from WSSC Commissioners or county council members.

WSSC's arguments miss the mark. For starters, its contention that legislative immunity and privilege require that investigations be halted where the parties might one day seek material protected by legislative privilege is questionable. It is one thing to recognize that state legislative bodies possess legislative immunity from suit. *See Consumers Union*, 446 U.S. at 733–34 (suggesting that state legislatures and their subcommittees enjoy legislative immunity against § 1983 suits). It is another, though, to extend that immunity, at least insofar as it is solely derived from some future hypothetical need for legislators' testimony, to investigations into other, non-legislative acts.

While claims of legislative immunity and privilege may assuredly be asserted to resist agency investigations into legislative acts, it is worth noting that our cases dismissing claims on legislative immunity and privilege grounds involved full-blown lawsuits. *See, e.g.*, *Baker v. Mayor and City Council of Baltimore*, 894 F.2d 679 (4th Cir. 1990), *overruled on other grounds by Berkley v. Common Council of the City of Charleston*, 63 F.3d 295, 303 (4th Cir. 1995) (en banc); *Schlitz v. Virginia*, 854 F.2d 43 (4th Cir. 1988), *overruled on other grounds by Berkley*, 63 F.3d at 303. The threat to legislative immunity and privilege in such circumstances is more acute than it is here; both sides have powers of coercive process, both sides are well aware of the evidence needed to prove or defend against known claims, and both parties' impending liability or recovery may thus depend on their ability to get legislators' testimony. In *Burtnick*, moreover, we did not order dismissal where the claims stemmed from the city council's vote to eliminate one filled position and create another empty one, instead allowing the case against the *municipality* to go forward but recognizing that *individual legislators* must remain free from both suit and process. *See*

*Burtnick*, 76 F.3d at 612–13. While WSSC's hybrid nature as a state-created agency that is largely controlled by two counties may give it a stronger claim to legislative immunity than the municipalities sued in *Burtnick* and *Berkley*, it would still be too hasty to cut off the EEOC's investigation into whether WSSC's unprivileged acts violated the ADEA just because a meritorious claim to immunity or privilege might eventually materialize.

We also cannot assume the EEOC's investigation will follow the path WSSC projects. The EEOC has stated that it "is not investigating WSSC's motives for the reorganization," and WSSC may hold it to that declaration. Moreover, as mentioned above, the EEOC's investigatory power here is not inexorably tied to the complainants' charges. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991). Aspects of the complainants' charge that would tread close to impermissible areas do not fatally undermine the EEOC's authority to investigate other instances of age discrimination that do not implicate the privilege and that the complainants intimate occurred at WSSC. In particular, the EEOC can continue with its stated current investigatory goals—determining whether WSSC discriminated in distributing training prior to the restructuring and whether it discriminated in hiring after the restructuring. The possibility that the agency may one day wander into impermissible terrain is not sufficient reason to halt what thus far seems a permissible inquiry.

B.

Indeed, we need not just take the EEOC's word regarding the scope of its scrutiny; its actions likewise suggest that WSSC's claim is premature. As mentioned above, the EEOC made several efforts to avoid requesting potentially privileged information. It properly rescinded its demand for records of internal deliberations about the restructuring and for the standards used in deciding to restructure. Equally sound was its decision to withdraw any investigation into the motives

underlying the decision to restructure. As the district court suggested, following these lines of inquiry would have brought the EEOC impermissibly close to privileged materials regarding the WSSC Commissioners' reasons for approving the proposed restructuring and the county council members' reasons for approving WSSC's budget, a "quintessentially legislative" act, *Bogan*, 523 U.S. at 55.

The modified subpoena skirts these potentially intrusive topics and focuses on evidence likely regarding unprivileged administrative personnel decisions. Take for example the request for lists of IT Department employees since 2005, the criteria used in making employment decisions since then, and records of allegations of age discrimination lodged after that time. This material likely goes toward WSSC's administrative decisions regarding training the IT Department's particular employees and responding to specific discrimination claims, not toward the county councils' decision to approve the budget or the WSSC Commissioners' work in preparing or passing along that budget. In the absence of evidence that these activities were part of the legislative process in some fashion, and with no evidence that legislators set the criteria for or participated in such decisions, we find no basis for declining to enforce the modified subpoena. *See United States v. Jefferson*, 546 F.3d 300, 310 (4th Cir. 2008).

The modified subpoena's requests for documents regarding events after the restructuring likewise appear to relate to administrative rather than legislative acts. It asks for records regarding the job descriptions for the new positions, the applications submitted for those positions, the criteria used in making the post-restructuring hiring decisions, and the names of former IT Department employees who applied for the posts. As far as we can tell at this early stage, these materials speak to particularized administrative decisions regarding how and whom to hire after the restructuring, not to the county councils' reasons for approving the budget or to any generally applicable, legislatively established policy regarding those

positions. The decisions also seem the kind that likely would be made by staff rather than by legislators themselves. We have no reason at this juncture to believe that legislative officials took part in making these hiring decisions, or even if they did, that they could fairly be characterized as legislative acts. *See Alexander v. Holden*, 66 F.3d 62, 65–66 (4th Cir. 1995).

Calling the activities that the modified subpoena seeks to investigate here "integral steps in the legislative process," *Bogan*, 523 U.S. at 55, would, at least on our present state of knowledge, expand legislative privilege beyond its proper bounds. Legislative acts, the ones for which the immunity and privilege are granted, typically involve the "adopt[ion of] prospective, legislative-type rules," *Alexander*, 66 F.3d at 67, rules that "'establish[ ] . . . a general policy' affecting the larger population," *id.* at 66 (quoting *Acevedo-Cordero v. Cordero-Santiago*, 958 F.2d 20, 23 (1st Cir. 1992)). They also generally bear the outward marks of public decisionmaking, including the observance of formal legislative procedures. *See, e.g.*, *Baraka v. McGreevey*, 481 F.3d 187, 198 (3d Cir. 2007). By contrast, "legislators' employment and personnel decisions are generally administrative acts" because they most often affect specific individuals rather than formulate broad public policy. *Alexander*, 66 F.3d at 66. By extending blanket protection to WSSC's pre-restructuring and post-restructuring employment activities, rejecting the modified subpoena at this stage would upset this relatively stable classification system and cast doubt on our previous decisions establishing it.

## IV.

Litigation by its nature features dark and bright sides of the moon. The dark side of subpoenas such as this lies in their threat to needed bureaucratic innovation and restructuring and in their potential threat to vitality and independence in the legislative branch. Legislative immunity and legislative privilege protect legislators from the perils of individual liability and

the distractions of compulsory process. We have these doctrines for apparent and important reasons. The public must be able to make its electoral selection from a wealth of qualified candidates, not simply the few undeterred or unaffected by the threat of financial liability, and those selected must be able to focus their entire energies on discharging their public duties, free from concerns about personal consequences and the hassles of lawsuits.

The other, brighter lunar side of course is the ability of Americans to work without the discrimination that the legislative branch has itself condemned. And the modified subpoena thus far advances this legislative intent without impairing legislative independence. At this preliminary stage of the investigation the EEOC has not sought testimony from the WSSC Commissioners or from county council members, and we do not yet know whether its investigation will even evolve into a lawsuit or whether defending such a suit would require legislators' testimony or involvement. The EEOC has also demonstrated its willingness to avoid infringing on potentially privileged territory, and the remaining materials it seeks appear to go largely to administrative employment decisions. On the present record, we see no basis for not enforcing the subpoena. The order of the district court is accordingly affirmed.

*AFFIRMED*