PRESENT: All the Justices

JOHN S. EDWARDS, ET AL.

v. Record No. 160643

RIMA FORD VESILIND, ET AL.

OPINION BY
CHIEF JUSTICE DONALD W. LEMONS
SEPTEMBER 15, 2016

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
W. Reilly Marchant, Judge

This appeal arises from a civil contempt order entered after the Division of Legislative Services ("DLS") and several Members of the General Assembly, invoking legislative privilege, refused to comply with a production order in a matter pending before the circuit court. The court held that legislative privilege, as set forth in the Speech or Debate Clause of Article IV, Section 9 of the Constitution of Virginia ("the Clause"),[1] does not extend to DLS or to documents and communications between Members of the General Assembly and consultants, DLS, or other third parties. For the reasons stated below, we conclude that the court abused its discretion by holding the appellants in contempt. With respect to the appellants in this case, the production order of February 16, 2016 and the provisions of the order of April 14, 2016 holding appellants in civil contempt will be vacated in part.

On appeal we are confined to the record developed in the court below and the assignments of error granted. Of necessity, our resolution of this case addresses legal principles implicated by the controversy but may not resolve specific application of these principles because the record is not fully developed.

---

[1] The Clause provides in pertinent part: "Members of the General Assembly . . . for any speech or debate in either house shall not be questioned in any other place." This opinion refers to Members of the General Assembly interchangeably as "Members" or "legislators." We note that there are numerous other bodies in the Commonwealth whose members perform legislative functions, such as boards of supervisors, city councils, etc. This opinion, however, is limited to consideration of the legislative privilege granted to Members of the General Assembly by the Constitution of Virginia.

## I. FACTS AND PROCEEDINGS

On September 14, 2015, plaintiff-appellees Rima Ford Vesilind, Arelia Langhorne, Sharon Simkin, Sandra D. Bowen, Robert S. Ukrop, Vivian Dale Swanson, H.D. Fiedler, Jessica Bennett, Eric E. Amarteis, Gregory Harrison, Michael Zaner, Patrick M. Condray, Sean Sullivan Kumar, and Dianne Blais (collectively, "the appellees") brought an action in the circuit court against the Virginia State Board of Elections, the Department of Elections, and various officers in their official capacities. The appellees alleged that House of Delegates districts 13, 22, 48, 72, and 88, and Senate districts 19, 21, 28, 29, 30, and 37 were not sufficiently contiguous, compact, and as nearly equal in population as practical, thereby violating Article II, Section 6 of the Constitution of Virginia. The appellees seek a declaration that these eleven districts are unconstitutional, seek to enjoin the use of the current district map in future elections, and seek other equitable relief as necessary.[2]

In November 2015, subpoenas duces tecum were served upon, as relevant to this appeal, Virginia Senators John Edwards, Ralph Smith, Richard Saslaw, Charles Colgan, David Marsden, and George Barker (collectively, "the Virginia Senators")[3] and DLS, demanding production of 17 categories of documents and communications, such as those relating to:

---

[2] On October 7, 2015, the House of Delegates and the Speaker of the House, William J. Howell, intervened as defendants seeking to preserve the redistricting plans. As a result of their voluntary intervention in the proceedings below, the House of Delegates and Speaker Howell were found to have waived legislative privilege and are not party to this appeal.

[3] Senator Richard Stuart also was served with a subpoena. Because Senator Stuart elected to comply with the court's order directing him to produce documents and communications subject to the subpoena, he is not party to this appeal. Also, Susan Schaar, Clerk of the Senate, although originally served with a subpoena, was not compelled to respond.

2

- compactness, total population, contiguity, total number of splits, communities of interest, and core retention of the challenged districts and adjacent districts

- development and prioritization of the criteria used to draft and modify the districts

- Senators' partisan considerations affecting the shape or composition of the districts or adjacent districts, including impact on incumbents

- the establishment and implementation of the 2001 redistricting criteria

- preclearance through the Virginia Attorney General's Office

- communications from the public concerning compactness

- map files and plans proposed, considered, or adopted, and

- any official or unofficial meeting of the General Assembly.

The DLS subpoena also requests "All documents consisting of electronic map files for redistricting plans which were used for any election for the House . . . or Senate of Virginia from 1980 to the present." The subpoenas seek production of all "documents or communications in your possession, custody or control, including items in the possession, custody or control of your agents, employees or attorneys."

The Virginia Senators and DLS filed motions to quash, claiming legislative privilege protected disclosure of the documents and communications sought. Following the submission of briefs and oral argument, the circuit court issued a letter opinion defining the scope of legislative privilege.

Relying on *Gravel v. United States*, 408 U.S. 606 (1972), the circuit court stated that "legislative privilege applies absolutely to purely internal legislative communications solely among legislators, and between legislators and legislative staff." However, adopting the analysis

3

in *Page v. Virginia State Board of Elections*, 15 F. Supp. 3d 657, 664 (E.D. Va. 2014), the court

then explained that it

> declines to extend the privilege beyond that core definition [protecting communications solely between legislators and other legislators or legislators and their staff] and finds that the individuals included within the legislative privilege are only the legislators and their legislative assistants and/or aides who are employed and paid by the individual legislator, a legislative committee, or the legislature as a whole.

The court required the Virginia Senators to answer all discovery at issue, although "such

responses shall be limited and protected by the scope of legislative privilege as defined [in the

letter opinion]."

As to DLS, the circuit court ruled that it

> is a legislative agency that serves legislators individually and collectively, but is not a legislator, a legislative committee, or the legislature as a whole, and is not a paid employee of the above. Therefore, DLS does not fall within the scope of this Court's definition of the legislative privilege and . . . shall answer the discovery propounded herein. Certainly, this includes all communications between DLS and legislators or their aides or staff, as well as documents or communications among DLS staff or between DLS staff and others.

Accordingly, on February 16, 2016, the circuit court entered an order denying the

Virginia Senators' motion to quash and requiring that they answer discovery requests "limited

and protected by the scope of the legislative privilege defined in the letter opinion." The court

also denied the motion to quash as to DLS, directing that it answer all discovery requests because

DLS falls outside the scope of legislative privilege.[4] In the same order, the court held that two

political consultants were third parties and did not fall within the scope of the privilege.

---

[4] The circuit court nonetheless granted legislative privilege to the Attorney General's office insofar as that office acted in a legislative capacity regarding preclearance of the

The Virginia Senators and DLS moved the circuit court to certify an interlocutory appeal. The court denied the certification request because the appellees' opposition prevented the parties from meeting the mutuality requirement of Code § 8.01-670.1. In the alternative, the Virginia Senators and DLS asked to be held in contempt in order to produce an appealable order. The appellees did not oppose this request. On April 14, 2016, the court held the Virginia Senators and DLS in contempt, assessing a fine of $100.00 per party per day. The circuit court stayed the collection of the fines imposed during the pendency of this appeal.

Before the Court of Appeals considered this matter, the parties filed a joint motion for certification to transfer the proceedings to this Court pursuant to Code § 17.1-409 (providing for expedited appeals when the case is of "such imperative public importance as to justify the deviation from normal appellate practice and to require prompt decision in the Supreme Court"). This Court granted the motion and set oral argument for special session on July 19, 2016.

## II. ASSIGNMENTS OF ERROR

In its sole assignment of error, DLS contends that:

1. The Circuit Court erred in holding that legislative work product and other materials concerning core legislative acts held in the custody of DLS, including communications between Virginia legislators and their staff, on the one hand, and DLS and its staff, on the other, are categorically excluded from the protections afforded in Virginia's Speech or Debate Clause.

The Virginia Senators raise three assignments of error, contending that:

1. The circuit court erred as a matter of law when it found the Virginia Senators in contempt of court because the court's underlying opinion and order held that the Speech or Debate Clause in Virginia's Constitution does not protect communications between the Virginia Senators and their staff with consultants when those communications are within the legislative sphere.

redistricting plan when it advised and advocated for changes in the map, thereby bringing the office under the "umbrella of the legislative privilege."

5

This was error because U.S. Supreme Court precedent concerning the substantially similar federal Speech or Debate Clause emphasizes function over form and, when within the legislative sphere, protects the communications and actions of non-legislators.

2. The circuit court erred as a matter of law when it found the Virginia Senators in contempt of court because the court's underlying opinion and order held that the Speech or Debate Clause in Virginia's Constitution does not protect communications between the Virginia Senators and their staff with third parties such as constituents and interest groups when those communications are within the legislative sphere. This was error because, in addition to the reasons stated in Assignment of Error 1 above, a Virginia circuit court has held that communications with constituents are absolutely privileged so as to encourage citizens to communicate with the legislature about pending legislation. *See Mills v. Shelton*, 66 Va. Cir. 415 (Va. Cir. Ct. 1998) (Bedford County). Furthermore, Fourth Circuit precedent has explicitly held that the federal Speech or Debate Clause protects communications between local legislators and interest groups. *See Bruce v. Riddle*, 631 F.2d 272 (4th Cir. 1980).

3. The circuit court erred as a matter of law when it found the Virginia Senators in contempt of court because the court's underlying opinion and order held that the Speech or Debate Clause in Virginia's Constitution does not protect communications between the Virginia Senators and their staff with the DLS when those communications are within the legislative sphere. This was error because the DLS is statutorily authorized to assist legislators in fulfilling their legislative duties. In addition to the reasons stated in Assignment of Error 1 above, the circuit court's ruling conflicts with holdings that the substantially similar federal speech or debate clause protects communications and actions of officials at the Government Accountability Office and the Congressional Research Service. *See Chapman v. Space Qualified Systems Corp.*, 647 F. Supp. 551 (N.D. Fla. 1986); *Webster v. Sun Co.*, 731 F.2d 1 (D.C. Cir. 1984).

## III. DISCUSSION

It is well-established law in Virginia that discovery disputes are generally "interlocutory and not subject to immediate appeal." *America Online v. Anonymous Publicly Traded Co.*, 261 Va. 350, 359, 542 S.E.2d 377, 382 (2001). However, an order of contempt for disobedience of a discovery order may be appealed before the conclusion of the underlying suit. *Id.* at 359 n.6, 542 S.E.2d at 382 n.6 (citing *HCA Health Services of Virginia v. Levin*, 260 Va. 215, 530 S.E. 2d 417 (2000)).

6

**A.     Standard of Review**

"[W]e review the exercise of a court's contempt power under an abuse of discretion standard." *Petrosinelli v. People for the Ethical Treatment of Animals*, 273 Va. 700, 706, 643 S.E.2d 151, 154 (2007).

> An abuse of discretion can occur in three principal ways: when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment.

*Landrum v. Chippenham & Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352, 717 S.E.2d 134, 137 (2011) (internal quotation marks and alteration omitted). "[W]hether a court possesses or lacks authority, and whether it has correctly identified and fulfilled the legal prerequisites to a discretionary act, are themselves significant factors in its consideration." *Lawlor v. Commonwealth*, 285 Va. 187, 213, 738 S.E.2d 847, 862 (2013).

"[A] party cannot be guilty of contempt of court for disobeying an order which the court had no authority of law to make." *Robertson v. Commonwealth*, 181 Va. 520, 537, 25 S.E.2d 352, 359 (1943) (internal quotation marks omitted). If, as the Virginia Senators and DLS contend, the Clause protects the documents and communications from discovery, the circuit court had no authority of law to compel their production and the legal prerequisite for holding the appellants in contempt was not fulfilled. This is a question of state constitutional interpretation that we consider de novo. *Lawlor*, 285 Va. at 240, 738 S.E.2d at 877. If the court erred by ruling that it had authority to compel production of the documents and communications, it necessarily abused its discretion when it held the appellants in contempt.

7

**B.      Issue of First Impression**

This appeal presents issues of first impression concerning the scope and application of legislative privilege under the Clause.  This Court recently acknowledged in *Board of Supervisors v. Davenport & Co.*, 285 Va. 580, 586, 742 S.E.2d 59, 61 (2013), that "the Virginia Supreme Court has not had occasion to construe the scope of the Virginia [S]peech or [D]ebate [C]lause."  (Internal quotation marks and citation omitted.)  *Davenport* involved issues of common law legislative immunity and therefore did not squarely implicate the questions before the Court today.[5]

We have said that, "[i]n construing constitutional provisions, the Court is not permitted to speculate on what the framers of a section might have meant to say, but are, of necessity, controlled by what they did say. . . .  It is a general rule that the words of a Constitution are to be understood in the sense in which they are popularly employed, *unless the context or the very nature of the subject indicates otherwise*." *Blount v. Clarke*, 291 Va. 198, 205, 782 S.E.2d 152, 155 (2016) (internal quotation marks and citations omitted) (emphasis added).  Although we have not had occasion to construe the Clause, the idea it expresses is not new.  Its language "is derived from" the similar provision in the federal Speech or Debate Clause found in Article I, Section 6 of the United States Constitution.  *Davenport*, 285 Va. at 587, 742 S.E.2d at 62.  Both provisions afford similar protections because they are based upon the same historical and public policy considerations.  *Id.* at 586, 742 S.E.2d at 61.

---

[5] Because the immunity at issue in *Davenport* derives from common law rather than the Clause, our decision today neither expands nor restricts the scope of the immunity discussed in that case.

The legislative privilege the Clause and its federal counterpart confer emerged from the twin principles of freedom of speech and legislative immunity in parliamentary law, and both principles appear historically in statutes dating as far back as 1512. 4 William Holdsworth, A History of English Law 91 n. 6 (1924); Privilege of Parliament Act 1512, 4 Hen. 8 c. 8 (Eng.), available at http://www.legislation.gov.uk/aep/Hen8/4/8/contents (last visited Sept. 7, 2016) (abrogating the judgment in *Strode's Case*). The term "freedom of speech," in its earliest usage in the English Parliament, referred solely to the freedom of members to speak positively or negatively about issues referred to them by the Crown.[6] 4 Holdsworth, *supra*, at 89-90. In the early 17th century, the House of Commons asserted a broader list of parliamentary privileges, including the right to freedom of speech, the right of freedom from arrest, the right to initiate legislation, and the right to decide the order of business in the House. 6 William Holdsworth, A History of English Law 95 (1924). Following the "Glorious Revolution," Parliament adopted the 1689 English Bill of Rights protecting the "Freedom of Speech, and Debates or Proceedings in Parliament" from being "impeached or questioned in any Court or Place outside of Parliament." 1 Wm. & Mary, Sess. 2, c. II.

Legislative privilege arose in the young American nation from the same underlying principles, combined with the uniquely American emphasis on separation of powers and representative government. *See Tenney v. Brandhove*, 341 U.S. 367, 373 (1951). Freedom of speech in the legislature "was deemed so essential for representatives of the people" that the

---

[6] This right was recognized in the House of Commons as early as the reign of Henry VIII, who sometimes sat in on its proceedings and earnestly encouraged its members' candid discussion. 4 Holdsworth, *supra*, at 91. Later in the 16th century, tensions emerged between Parliament and the Crown as to the power to introduce legislation and control over the parliamentary agenda. *Id.* at 89-90, 178-180.

9

federal Speech or Debate Clause appeared first in the Articles of Confederation and then in the Constitution, with little change. *Id.* at 372-73 ("Freedom of speech and action in the legislature was taken as a matter of course by those who severed the Colonies from the Crown and founded our Nation. . . . The provision in the United States Constitution was a reflection of political principles already firmly established in the States.")

Here, "[i]n Virginia, as well as in the other colonies, the assemblies had built up a strong tradition of legislative privilege long before the Revolution." *Id.* at 374 n.3. Those principles were codified in Virginia statutes[7] before appearing in the Constitution of Virginia of 1870.[8] The Constitution of 1902 brought a linguistically modernized but substantively similar version of its predecessor, 1 A.E. Dick Howard, Commentaries on the Constitution of Virginia 511-12 (1974), and this version remains in effect today.

The Clause was not introduced into the Constitution of Virginia devoid of history or context, nor should it be interpreted as if it had. Rather, it is deeply rooted in British and American law. To ignore this rich history in favor of a narrow interpretation would flout the framers' obvious intent. The Clause is an integral piece of the separation of powers framework, one of the most central and enduring principles of the Constitution of Virginia. As part of the list

---

[7] *See* Laws of Virginia, March 1623, James 1st, § 11 (immunity from arrest); 1789 Acts ch. 248 (immunity for words spoken or written in the General Assembly).

[8] Article V, Section 11 of the 1870 Constitution of Virginia provided:

The members of the general assembly shall, in all cases except treason, felony, or breach of the peace, be privileged from arrest during the sessions of their respective houses; and for any speech or debate in either house, they shall not be questioned in any other place. They shall not be subject to arrest under any civil process, during the session of the general assembly, nor for fifteen days next before the convening and after the termination of each session.

of "Immunities of legislators" in Article IV, Section 9, the Clause represents one of the specific

and significant bulwarks the Constitution erects to protect the legislature from improper

interference by the executive branch and the judiciary. Legislative privilege necessarily must be

robust in order to preserve constitutional separation of powers and prevent interference with the

legislative process. The "freedom of speech and debate" is a "great and vital privilege . . .

without which all other privileges would be comparatively unimportant or ineffectual." *Kilbourn*

*v. Thompson*, 103 U.S. 168, 204 (1881) (internal quotation marks and citation omitted).

Accordingly, it must be addressed with an eye toward promoting, not eroding, the separation of

powers principles integral to the sound government of this Commonwealth.

## C.     Defining the Privilege

The principal questions in defining legislative privilege under the Clause are what does

the privilege protect, and who may invoke that protection. However, because this case arises

from an order compelling discovery in response to subpoenas duces tecum, we must first

consider the threshold question whether the protection provides only immunity from liability or

extends to evidentiary privilege. Once a court determines that legislative privilege attaches, it is

absolute in nature. *Story v. Norfolk-Portsmouth Newspapers, Inc.*, 202 Va. 588, 590, 118 S.E.2d

668, 669 (1961).

### 1.     The Nature of the Protection Afforded by Legislative Privilege

The Clause states, "Members of the General Assembly . . . for any speech or debate in

either house shall not be *questioned* in any other place." (Emphasis added.) The term

"questioned" should be understood broadly to mean "subjected to examination by another body."

*See, e.g., Gravel,* 408 U.S. at 616 (observing that the Clause "was designed to assure a co-equal

11

branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from" another branch of government); *Davenport,* 285 Va. at 587, 742 S.E.2d at 62 (observing that the Clause, "which is derived from the Speech or Debate Clause of the United States Constitution, affords General Assembly members with immunity that protects them from being called into an outside forum to defend their legislative actions"). The very nature of the Clause concerns the separation of powers and the protection of legislative processes. At its essence, it prevents intrusion into the legislative process from the executive branch or from a "possibly hostile judiciary." *Id.* at 617. Therefore, when it applies, legislative privilege confers immunity from criminal prosecution, *United States v. Johnson*, 383 U.S. 169, 184-85 (1966), and civil suit. *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967) (under the federal Speech or Debate Clause, legislators are "protected not only from the consequences of litigation's results but also from the burden of defending themselves"); *see also Powell v. McCormack*, 395 U.S. 486, 505 (1969) ("The purpose of the protection afforded legislators is . . . to insure that legislators are not distracted from or hindered in the performance of their legislative tasks by being called into court to defend their actions.").

Courts have also held that when legislative privilege applies, it protects against both compulsory testimony and compulsory production of evidence. *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 418, 420-21 (D.C. Cir. 1995) ("A party is no more entitled to compel congressional testimony – or production of documents – than it is to sue congressmen."). Evidentiary privilege exists as a natural outgrowth of the original English parliamentary privileges as applied in the Commonwealth. The function of the parliamentary privilege was to insulate legislators from harassment, "not with the intention of protecting the members against

12

prosecutions for their own benefit, but to support the rights of the people." *Kilbourn*, 103 U.S. at 203 (quoting *Coffin v. Coffin*, 4 Mass. 1, 27 (1808)). "Legislative privilege against compulsory evidentiary process exists to safeguard this legislative immunity and to further encourage the republican values it promotes." *EEOC v. Washington Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011).

Protection from compulsory production of privileged evidence is a necessary corollary to immunity. "Documentary evidence can certainly be as revealing as oral communications," and subjecting legislators to "[d]iscovery procedures can prove just as intrusive" as naming legislators as parties to a lawsuit. *Brown & Williamson Tobacco Corp.*, 62 F.3d at 418, 420-21. "Because litigation's costs do not fall on named parties alone, [legislative] privilege applies whether or not the legislators themselves have been sued." *Washington Suburban Sanitary Comm'n*, 631 F.3d at 181; *see also Arizona Indep. Redistricting Comm'n v. Fields*, 75 P.3d 1088, 1098 (Ariz. Ct. App. 2003) ("We are persuaded the legislative privilege protects against disclosure of documents in appropriate circumstances . . . . Even though such documents will not be used in any evidentiary proceeding, their mere disclosure could 'chill' legislators from freely engaging in the deliberative process necessary to the business of legislating."). "[A] key purpose of the privilege is to prevent intrusions in the legislative process and that the legislative process is disrupted by the disclosure of legislative material." *United States v. Rayburn House Office Bldg., Room 2113*, 497 F.3d 654, 660 (D.C. Cir. 2007). Accordingly, documentary evidence is subject to legislative privilege under the Speech or Debate Clause.

Because the purpose of legislative privilege is to protect the legislature from intrusion by the other branches of government and to disentangle legislators from the burden of litigation and

13

its detrimental effect on the legislative processes, *Davenport,* 285 Va. at 588-89, 742 S.E.2d at 63 (internal quotation marks and citations omitted); *see Gravel*, 408 U.S. at 617, a legislator is generally not required to produce a detailed privilege log in order to invoke the privilege. A legislator must merely address, in describing the function of the evidence requested (and, in the case of a communication, with whom such communications would have occurred), why the privilege would apply. Courts may request more information only when essential to determine whether the privilege should attach and in some cases, review of such additional information may be required *in camera*.

Having established that legislative privilege extends beyond mere immunity from prosecution and suit to protect compulsory production of evidence, we next turn to the questions of what the privilege protects and who may invoke that protection.

### 2.  To What the Privilege Applies

The Clause provides that legislative privilege may be invoked to protect "any speech or debate in either house." Va. Const. art. IV, § 9. It is "incontrovertible" that this protection applies to any statement made during an official legislative proceeding, such as on the floor of either chamber while it is in session or during a meeting of a legislative committee or subcommittee wherever it may sit. *See Gravel*, 408 U.S. at 615-16 (holding that legislators are absolutely protected with respect to events that occur at a subcommittee meeting); *see also Hutchinson v. Proxmire*, 443 U.S. 111, 124-25 (1979) (noting that judicial interpretations of the federal Speech and Debate Clause are *extensions* of the literal meaning).

However, by the time the Clause was adopted in Virginia, the phrase "speech or debate in either house" already had become a term of art signifying a "sphere of legitimate legislative

14

activity" that was not necessarily tied to official legislative proceedings, but to essentials of the legislative process. *Tenney*, 341 U.S. at 376-77 (coining the phrase "sphere of legitimate legislative activity"); *Kilbourn*, 103 U.S. at 203-204 (quoting *Coffin*, 4 Mass. at 27). In 1808, the Massachusetts Supreme Court stated that the legislative sphere referred to in that state's similar speech or debate clause was not confined to

> delivering an opinion, uttering a speech, or haranguing in debate; but will extend . . . to the giving of a vote, to the making of a written report, and to every other act resulting from the nature, and in the execution, of the office; and . . . every thing said or done by him, as a representative, in the exercise of the functions of that office, without inquiring whether the exercise was regular according to the rules of the house, or irregular and against their rules.

*Coffin*, 4 Mass. at 27. Six decades before the Clause was adopted, speech or debate in either house was understood to apply to the many facets of the legislative process. *Id*. at 28 (holding that legislative privilege attaches to the "exercise of [the legislator's] functions").

In *Davenport*, we emphasized these same principles, invoking similar language as to legislators "acting [with]in the sphere of legitimate legislative activity": "Legislative actions include, but are not limited to, delivering an opinion, uttering a speech, or haranguing in debate; proposing legislation; voting on legislation; making, publishing, presenting, and using legislative reports; authorizing investigations and issuing subpoenas; and holding hearings and introducing materials at Committee hearings." 285 Va. at 589, 742 S.E.2d at 63 (internal quotation marks and citations omitted).

The emphasis in the Constitution of Virginia on separation of powers also lends support to a broad understanding of legislative privilege. The Clause falls among several other enumerated privileges, all designed to protect legislators from undue interference with the legislative process. It would be of little use to protect speech or debate between legislators on

15

the floor of either house but not to protect other communications or functions integral to the legislative process. Accordingly, the phrase "any speech or debate in either house," as used in the Clause, refers to communications or acts integral to the sphere of legitimate legislative activity, whether in an official legislative proceeding or not.

> However, legislators

> engage in many activities other than the purely legislative activities protected by the Speech or Debate Clause. These include a wide range of legitimate errands performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called news letters to constituents, news releases, and speeches delivered outside the [General Assembly]. The range of these related activities has grown over the years. They are performed in part because they have come to be expected by constituents, and because they are a means of developing continuing support for future elections. Although these are entirely legitimate activities, they are political in nature rather than legislative, in the sense that term has been used by [courts]. But it has never been seriously contended that these political matters, however appropriate, have the protection afforded by the Speech or Debate Clause. Careful examination of the decided cases reveals that the [courts] ha[ve] regarded the protection as reaching only those things generally done in a session of the [legislature] by one of its members in relation to the business before it, or things said or done by [a legislator], as a representative, in the exercise of the functions of that office.

*United States v. Brewster*, 408 U.S. 501, 512 (1972) (internal quotation marks and citations omitted).

Accordingly, legislative privilege applies only to acts within the sphere of legitimate legislative activity. Va. Const. art. IV, § 9; *see United States v. Helstoski*, 442 U.S. 477, 491 (1979) (barring inquiry into "the sphere of protected legislative activities"); *Gravel*, 408 U.S. at 625 ("Legislative acts are not all encompassing . . . . [T]hey must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction

of either House."). Whether such an act falls within the sphere of legitimate legislative activity requires the court to assess, on the whole, the function it serves. In the case of a communication, a court must also consider the persons by and to whom it is made.

A legislator's communication regarding a core legislative function is protected by legislative privilege, regardless of where and to whom it is made. *See Coffin*, 4 Mass. at 27 (holding that the legislative sphere includes "every thing said or done by [the legislator], as a representative, in the exercise of the functions of that office"). A legislator's communication not regarding such a function is not protected, unless it is made during an official legislative proceeding. *See Gravel*, 408 U.S. at 615-16; *see also Hutchinson*, 443 U.S. at 124-25. For example, two legislators could not invoke the privilege for a conversation regarding reelection strategy or vacation plans, *see Davenport*, 285 Va. at 590, 742 S.E.2d at 63-64 ("Legislative immunity will not protect [legislators] when they step outside the function for which their immunity was designed.") (internal quotation marks and citation omitted); *see also Brewster*, 408 U.S. at 512, unless the conversation occurred, for example, on the floor of a chamber while it is in session. Va. Const. art. IV, § 9.

### 3. Who May Invoke the Privilege

#### a. Members

The Clause provides that "[m]embers of the General Assembly . . . for any speech or debate in either house shall not be questioned in any other place." This Court has previously observed in *Davenport* that this language, by its terms, applies to "[m]embers." 285 Va. at 587, 742 S.E.2d at 62 ("This provision . . . affords General Assembly *members* with immunity that protects them from being called into an outside forum to defend their legislative actions."

17

(emphasis added)).  A Member's legislative privilege necessarily must be robust in order to preserve constitutional separation of powers and prevent interference with the legislative process.  As previously noted, the "freedom of speech and debate" is a "great and vital privilege . . . without which all other privileges would be comparatively unimportant or ineffectual." *Kilbourn*, 103 U.S. at 204 (internal quotation marks and citation omitted).

Applying these principles, under the Constitution of Virginia, a Member of the General Assembly holds the legislative privilege regarding communications protected by the Speech or Debate Clause.  The privilege may be invoked and waived only by the legislator or legislators who hold the privilege.  So long as the communications concern matters protected by the Speech or Debate Clause, legislators' communications with other legislators are cloaked with constitutional legislative privilege.  *Accord Gravel*, 408 U.S. at 622.  This rule applies both to protect communications between legislators and among legislative committees which, of course, are composed of legislators.  Accordingly, legislative privilege belongs to the legislator.[9]  However, the rulings of the circuit court and the assignments of error require us to consider whether the privilege may be invoked by a non-legislator.  We hold that under certain circumstances, it may.  *Gravel*, 408 U.S. at 616-17.

b.      **Alter-Egos:  Invocation by Non-Legislators**

The extent to which a non-legislator may invoke the privilege is informed by the United States Supreme Court's alter-ego doctrine set forth in *Gravel*, 408 U.S. at 616-17, allowing non-

---

[9] One legislator's waiver of the privilege may not impair another legislator's right to invoke it.  For example, if two legislators draft a bill and one waives his or her privilege regarding the bill's development in response to a subpoena, the other legislator retains the right to invoke the privilege and thereby protect the communications from discovery.

legislators serving legislative functions for legislators to, under some circumstances, invoke the legislator's privilege with the legislator's permission.

In *Gravel*, the government subpoenaed Dr. Leonard Rodberg, a resident fellow at the Institute of Policy Studies, whom Senator Gravel added to his staff mere hours before a subcommittee meeting at which Gravel read from sensitive material and placed it in the public record. *Id*. at 608-09. Dr. Rodberg assisted Gravel in preparing for and conducting the meeting. *Id*. at 609. The lower courts barred the government from questioning Dr. Rodberg about his interview with Gravel and observations and communications arising from his employment with Gravel. *Id*. at 611-12. The federal court of appeals observed that it was necessary "for a legislator to have personal aides in whom he reposes total confidence." The relationship "could not exist unless, during the course of his employment, the aide and the legislator were treated as one," and "this synonymity is founded upon the relationship, not on the fact of employment." *United States v. Doe*, 455 F.2d 753, 761 (1st Cir. 1972).

Agreeing with the lower courts' analysis and upholding the protective order as to Gravel's aide, the Supreme Court held the federal Speech or Debate Clause "prohibits inquiry into things done by Dr. Rodberg as the Senator's agent or assistant which would have been legislative acts, and therefore privileged, if performed by the Senator personally." *Gravel*, 408 U.S. at 616. The Supreme Court recognized that application of the privilege to alter egos of the legislators, when performing legislative functions, was vital to a functioning legislative process. *Id*. at 617.

Accordingly, when a non-legislator seeks to invoke the privilege under the Clause, a court is presented with a threshold question: whether the individual is functioning in a

19

legislative capacity on behalf and at the direction of a Member. If so, this non-legislator is acting as an alter ego of the legislator and may, with the legislator's permission, invoke the legislator's privilege. The alter ego's actions on behalf of the legislator are then protected as though they were the legislator's actions. *See Gravel*, 408 U.S. at 622. However, where the legislator would not be protected by the privilege if the act was done by the legislator himself or herself, such as where the act falls outside the scope of legitimate legislative activity, his or her alter ego is likewise unprotected.[10] Just as a communication within the sphere of legitimate legislative activity between two legislators is protected, so too is an alter ego's communication with a legislator, or even a communication between two alter egos.

Factors for the court to consider in determining whether an individual functions as an alter ego include the individual's relationship with the legislator, the individual's identity, and the source or terms of the individual's pay, if any. This list is not exhaustive, and no one factor is determinative. Based on the totality of the circumstances, courts must evaluate function: whether the person is acting as "one" with the legislator, *id*. at 616-17, and whether the individual is functioning in a legislative capacity. *See id*. at 622.

The first factor, the relationship with the legislator, bears both on function and whether the individual was truly acting on behalf of the legislator. A subordinate or employee working on legislative matters, such as a legislative staffer or DLS employee, is likely to perform legislative functions on behalf of the legislator. A constituent with whom the legislator has had only one contact is unlikely to be acting on the legislator's behalf. An individual need not be a

---

[10] Because the privilege belongs to the legislator, non-legislators may not waive a legislator's privilege. *Gravel*, 408 U.S. at 622 & n.13. Consequently, a legislator may invoke the privilege to prevent his or her non-legislator agent's disclosure of material it protects.

20

legislator's personal staffer to function within the ambit of the Speech or Debate Clause's protections. *See Doe v. McMillan*, 412 U.S. 306, 312 (1973) ("[I]t is plain to us that the complaint in this case was barred by the Speech or Debate Clause insofar as it sought relief from the Congressmen-Committee members, from the Committee staff, from the consultant, or from the investigator. . . ."); *Rangel v. Boehner*, 785 F.3d 19, 25 (D.C. Cir. 2015) (legislative alter egos may come "from all walks of legislative life"). In all cases, however, the alter ego must function as an extension of the legislator, not on behalf of the interests of others. *Fields*, 75 P.3d at 1098 ("[A] legislator may invoke the legislative privilege to shield from inquiry the acts of independent contractors retained by that legislator that would be privileged legislative conduct if personally performed by the legislator.").

Next, the individual's identity informs whether he or she is likely to be functioning in the legislative sphere. For example, policy consultants are more likely to be working in the legislative sphere than political or media consultants. A lawyer working for the legislative branch is more likely to be working in the legislative sphere than someone who specializes in information technology. Admittedly, attempts to draw fine lines between policy and politics will in many cases prove to be illusive. Nonetheless, to the extent that particular communications can be considered policy oriented, they are likely to fall within the legislative sphere.

Third, the source of an individual's remuneration, if any, may also be relevant to this inquiry to the extent it informs his likely function. The nature of a remuneration agreement may inhibit some individuals from acting on "behalf" of a legislator. However, it is the individual's function, not the fact or form of employment, that informs whether the individual acts as an alter ego. *See Gravel*, 408 U.S. at 622; *see Fields*, 75 P.3d at 1098 ("[F]unction trumps title.").

21

The circuit court acknowledged that communication between legislators and their aides could be privileged. However, relying on *Page*, 15 F. Supp. 3d at 663, which in turn relied on Code § 30-19.20, the circuit court utilized a dispositive test requiring that a party be employed and paid by the General Assembly for privilege to attach. Code § 30-19.20, a statutory provision, cannot serve to limit the legislative privilege set forth in the Constitution of Virginia. Further, that statute relates to the hiring of employees for the General Assembly. Code § 30-19.20 does not inform this issue. *Gravel* did not turn on compensation.[11] The circuit court therefore erred in finding that DLS and DLS employees could not, as a matter of law, act in an alter ego capacity.

The circuit court also erred to the extent it held there is a categorical bar against a consultant serving as the alter ego of a legislator.[12] Although the nature of a consultant's engagement may bear upon whether the communications with the legislator are within the legislative sphere, or purely political and outside the legislative sphere, the form of hire as a "consultant," standing alone, is not dispositive. "*Gravel* turned on the function fulfilled by [the aide] rather than his job title." *Fields*, 75 P.3d at 1097. Other state courts applying *Gravel* in redistricting litigation have observed that consultants serve a vital function to part-time legislators who lack the budget necessary to hire staffers with specialized areas of expertise. *See*

---

[11] Neither the lower courts' opinions nor the Supreme Court's opinion disclosed whether and how much Dr. Rodberg was paid for his services on Gravel's behalf.

[12] The appellees acknowledge that, if a legislator or group of legislators hired an outside consultant on a legislative matter, communications with the consultant could relate to the legislative process. However, the appellees assert the consultant would not function as an alter ego because Code § 30-19.20 does not deem consultants "necessary." As discussed above, that argument is not persuasive.

22

*Fields*, 75 P.3d at 1097-98; *Holmes v. Farmer*, 475 A.2d 976, 983-84 (R.I. 1984). Further, although the consultants in *Fields* were retained by Arizona's independent redistricting commission, not the state legislature, that court observed that, in that case, the "manner of employment does not affect the consultant's function within the legislative process." *Fields*, 75 P.3d at 1097-98. As with DLS, the focus must be upon the consultant's function in the sphere of legitimate legislative activity and the nature of the consultant's relationship with the Member.

The circuit court further erred by holding that, as a matter of law, communications between legislators and constituents or other third parties cannot be protected by legislative privilege. Such individuals are equally capable of performing acts as alter-egos, subject to the same requirements that the acts that they perform both fall within the sphere of legitimate legislative activity and are delegated by the legislator to be performed on his or her behalf. Any basis on which to differentiate a constituent or other third party from a legislator's personal legislative staffer, including unpaid interns, or consultants would be artificial. *Doe*, 455 F.2d at 761. Provided the legislator has requested the constituent or third party's assistance in the performance of a legislative act, the privilege applies to that individual as much as to any other alter ego. However, unsolicited communications and acts taken by the constituent or third party on his or her own initiative will not satisfy this test, even when closely connected to legitimate legislative activity.

In this case, due to the early stage of discovery, this Court cannot speculate as to potentially privileged communications involving third parties. However, the circuit court erred in concluding legislative privilege could not, as a matter of law, apply to communications between legislators or their staff and third parties.

23

The Clause allows legislators to fulfill their legislative duties without undue interference. That legislators seek assistance in accomplishing these functions does not diminish this goal or this protection. It would be of little use to protect acts regarding the drafting of a bill when performed by a legislator but not an agent at the legislator's direction. Legislators must be free to accomplish legislative tasks through agents, including and especially to obtain assistance in legislative drafting from the experienced staff at DLS.[13] Focusing on function affords the legislator the ability to make use of agents with particular areas of expertise and to delegate substantial workloads. Refusing to protect such requests and DLS' resulting work product as privileged would frustrate the purposes of the Clause, as commonly understood, and severely hamper the legislative process.

## IV. CONCLUSION

On this record, the circuit court abused its discretion by holding the Virginia Senators and DLS in contempt because it erroneously ruled that the materials sought in the appellants' subpoenas duces tecum were not protected by the legislative privilege enshrined in the Clause. Accordingly, the portion of the April 14, 2016 order holding the Virginia Senators and DLS in contempt will be vacated. The portions of the February 16, 2016 order that are inconsistent with this opinion will be vacated, and the case will be remanded for further proceedings consistent with this opinion.

---

[13] The Code of Virginia directs that delegation to DLS is made to DLS as an entity. *See* Code § 30-28.18 ("All requests for the drafting of bills or resolutions *by the Division* shall be submitted in person, in writing, or by voice transmission." (emphasis added)). Therefore, legislative privilege covers all relevant delegated legislative work within DLS and, with a legislator's permission, may be invoked by the agency or the staffers who are engaged in this work.

*Vacated in part and remanded.*