# IN THE SUPREME COURT OF IOWA

No. 18–1431

Filed May 3, 2019

**BERTHA MATHIS, STEPHEN MATHIS, TILLFORD EGLAND, THOMAS STILLMAN, LOIS STILLMAN, MICHAEL REDING,** and **SUZANNE REDING,**

    Appellants,

vs.

**PALO ALTO COUNTY BOARD OF SUPERVISORS,**

    Appellee,

and

**PALO ALTO WIND ENERGY, L.L.C.** and **MIDAMERICAN ENERGY COMPANY,**

    Appellees.

---

Appeal from the Iowa District Court for Palo Alto County, Nancy L. Whittenburg, Judge.

Landowners appeal a district court order granting summary judgment and sustaining the actions of a county board of supervisors adopting a wind energy ordinance and approving a wind energy project. **AFFIRMED.**

Wallace L. Taylor of Law Offices of Wallace L. Taylor, Cedar Rapids, and John M. Murray of Murray and Murray, Storm Lake, for appellants.

Sheila K. Tipton, Haley R. Van Loon, and Adam C. Van Dike of Brown, Winick, Graves, Gross, Baskerville & Schoenebaum, PLC, Des

Moines, and Peter C. Hart, Palo Alto County Attorney, for appellee Palo Alto County Board of Supervisors.

Bret A. Dublinske and Brant M. Leonard, of Fredrikson & Byron, P.A., Des Moines, for appellees Palo Alto Wind Energy, L.L.C. and MidAmerican Energy Company.

**MANSFIELD, Justice.**

In this case we are called upon to review the decisions of a county board of supervisors approving a wind energy ordinance and a specific wind energy project. Although the challengers raise a number of well-presented arguments, in the end we conclude they were matters for the board of supervisors—not the courts—to resolve. We therefore affirm the judgment of the district court granting summary judgment and dismissing the plaintiffs' claims.

## I. Background Facts and Proceedings.

In late July 2015, the development manager for a renewable energy company asked Joseph Neary, the Palo Alto County planning and zoning administrator, about Palo Alto County's zoning ordinances relating to wind energy turbines. Approximately four months later, Mark Zaccone of another company, Invenergy, L.L.C., contacted Neary with the same inquiry. Invenergy is the parent company of Palo Alto Wind Energy, L.L.C. (PAWE). Invenergy was interested in developing a 340-megawatt, 170-turbine wind energy project in Palo Alto County that would be owned and operated by MidAmerican Energy Company (MidAmerican).

At that time, there were only a few wind turbines in Palo Alto County. The existing ordinance, which had been modified most recently in 2003, contained only a single paragraph devoted to wind turbines. The members of the Palo Alto County Planning and Zoning Commission believed that a more detailed ordinance was needed.

During the first half of 2016, County Attorney Peter Hart worked on drafting a new zoning ordinance, modeling his efforts on ordinances from other Iowa counties. Invenergy personnel interacted with Hart and offered suggestions during the drafting process. However, Invenergy and MidAmerican were not satisfied with the final draft that emerged from the

Commission meeting on August 11. On August 26, they sent strongly worded written comments to each member of the Palo Alto County Board of Supervisors, explaining that "nearly all of these revisions are necessary in order to establish a wind ordinance that will actually allow a wind project to be developed."

Among other things, Invenergy and MidAmerican urged the Board to reconsider the Commission's proposed 2640-foot setback for wind turbines from permanent residential dwellings. They said such a setback "would make developing a Wind Energy Conversion System in the County practically impossible." They pointed out that other counties have generally implemented a 1000- to 1320-foot setback, and a setback greater than 1500 feet "would make it virtually impossible for Invenergy to move forward with the proposed project and may very well deter other wind development within the County." Invenergy and MidAmerican also proposed that the Board modify a proposed 2640-foot setback from cemeteries in favor of a 1000-foot setback.

In addition, Invenergy and MidAmerican urged the Board to remove a provision from the ordinance that prohibited the occurrence of *any* shadow flicker on an existing residential structure, explaining that shadow flicker (i.e., the shadows cast by a rotating turbine within a residence) "is an unavoidable consequence of having an operational Wind Energy Conversion System in the County." Invenergy and MidAmerican proposed instead a provision that

> no non-participating Permanent Residential Dwelling will experience more than 30 hours per year of shadow flicker under planned operating conditions. If an owner of a non-participating Permanent Residential Dwelling experiences more than 50 hours of shadow flicker per year under . . . normal operating conditions, then the Owner/Developer shall be obligated to mitigate such shadow flicker to comply with the terms of this ordinance.

Other modifications were also sought. In conclusion, their letter made it clear that without a number of these requested changes, the 340-megawatt wind project would not go forward.

In September, the Board approved a modified wind energy ordinance that incorporated a number of Invenergy and MidAmerican's demands, including a minimum setback of 1500 feet from residences. However, the Board did not adopt everything Invenergy and MidAmerican had requested. For shadow flicker, the ordinance imposed a mitigation obligation whenever thirty hours per year (not fifty) of shadow flicker occurred. The ordinance also established a 1500-foot setback (not 1000) from cemeteries.

Three public readings of the ordinance occurred on September 13, September 20, and September 27. At the final public reading on September 27, the Board unanimously passed and approved the "Wind Energy Conversion Systems Ordinance" (Ordinance) for Palo Alto County.

Nearly one year later, on August 31, 2017, Invenergy and its subsidiary PAWE submitted an application for site plan review and approval. The application requested approval for the 340-megawatt wind energy project, including 199 potential turbine locations.

The Board held an informational meeting on the application on September 21 and a public hearing on October 5. The project was discussed as well at other public Board meetings in September and October. The Board also received correspondence from the Iowa Department of Natural Resources and the state archaeologist who made recommendations for reducing or avoiding environmental or cultural harms the project could cause. In addition, the Board received a report from acoustician Richard James of E-Coustic Solutions contending the

sound volume produced by the wind energy project would at times exceed fifty decibels in violation of the ordinance.

On October 24, the Board held a further meeting and received additional oral and written comments, including remarks by plaintiff Stephen Mathis. At the conclusion of the meeting, the Board granted conditional approval to PAWE's application by a 3–2 vote.

At the time of the approval, PAWE and not MidAmerican owned the project. However, MidAmerican acknowledged that it "intend[ed] to acquire, but ha[d] not yet acquired, the Project from PAWE based on and subject to certain development milestones pursuant to a purchase agreement executed by PAWE and MidAmerican." MidAmerican was not then legally obligated to acquire the project and could have terminated the asset purchase agreement for its convenience.

On November 22, the plaintiffs filed a petition for declaratory and injunctive relief and for a writ of certiorari against the Board in the Iowa District Court for Palo Alto County. As amended, the petition sought (1) a declaration that the ordinance was arbitrary, capricious, unreasonable, void, and unenforceable; and (2) a writ determining that the approval of PAWE's application should be set aside as illegal, arbitrary, capricious, unreasonable, and void. PAWE and MidAmerican were granted leave to intervene as defendants.

On June 8, 2018, PAWE and MidAmerican filed a motion for summary judgment seeking to dismiss the plaintiffs' claims. On June 11, the Board joined in PAWE and MidAmerican's motion. On July 25, the district court entered an order sustaining the motion for summary judgment. The plaintiffs appealed, and we retained the appeal.

## II. Standard of Review.

"We review summary judgment rulings for correction of errors at law." *Johnson Propane, Heating & Cooling, Inc. v. Iowa Dep't of Transp.*, 891 N.W.2d 220, 224 (Iowa 2017). "Summary judgment is appropriate if the record, shows 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *TSB Holdings, L.L.C. v. Bd. of Adjustment for City of Iowa City*, 913 N.W.2d 1, 10 (Iowa 2018) (quoting Iowa R. Civ. P. 1.981(3)).

Regarding certiorari proceedings, we have held,

[T]he district court finds the facts anew only to determine if there was illegality not appearing in the record made before the board. Fact-findings or issues that were before the board for decision are "reviewed under the substantial evidence standard."

*Id.* (citation omitted) (quoting *Bontrager Auto Serv. v. Iowa City Bd. of Adjustment*, 748 N.W.2d 483, 494–95 (Iowa 2008)).

## III. Analysis.

## A. Legality of the Ordinance.

We start this discussion with the strong presumption of the validity of the ordinance and amendments thereto. If the reasonableness of the amendment is fairly debatable, we will not substitute our judgment for that of the Board of Supervisors.

*Perkins v. Bd. of Supervisors of Madison Cty.*, 636 N.W.2d 58, 67 (Iowa 2001) (citation omitted); *see also TSB Holdings*, 913 N.W.2d at 14. "[T]he general rule [is] that zoning determinations are a legislative function of a city council or board of supervisors." *Residential & Agric. Advisory Comm., LLC v. Dyersville City Council*, 888 N.W.2d 24, 40 (Iowa 2016).

The plaintiffs do not contend that the ordinance was procedurally or substantively improper, or that it varies significantly from wind energy ordinances adopted in other Iowa counties. Instead, their objection is that

Invenergy and MidAmerican allegedly wrote the ordinance, thus rendering it illegal.

We are not persuaded. The record indicates that the ordinance was drafted primarily by County Attorney Hart. Invenergy and MidAmerican had input on the ordinance, and on August 26, 2016, made clear that they could not go forward unless certain modifications were made. However, the mere fact that an ordinance incorporates one or more requests from a private party does not make the ordinance unlawful. Lobbying our government is every citizen's constitutional right, and both the plaintiffs and the intervenors exercised that right here. *See* Iowa Const. art. I, § 20 ("The people have the right freely to assemble together to counsel for the common good; to make known their opinions to their representatives and to petition for a redress of grievances.").

We draw guidance from our decision in *Montgomery v. Bremer County Board of Supervisors*, 299 N.W.2d 687 (Iowa 1980). There we held that the mere fact that rezoning had been requested by a company proposing to erect and operate a hog-slaughtering plant did not render it unlawful. *Id.* at 691, 695. We noted, "While the rezoning was prompted by the request from Hormel, the Board did not merely rubberstamp the request." *Id.* at 695.

The same is true here. The Board considered Invenergy and MidAmerican's suggestions and accepted some but not all of them. The members educated themselves and made their own decisions. As one supervisor put it, "I spent two hours a day for one month calling all over the United States checking on wind energy." This supervisor understood that "Invenergy gets more money the more windmills they put up . . . ." He believed the 1500-foot setback that was ultimately adopted came out of Wisconsin as he "talked to some people up there." While defending the

process by which the ordinance was adopted, this supervisor ultimately voted *against* the PAWE project. As he explained, after circulating a questionnaire in his district, "it [came] back pretty strong in my questionnaire that in my district they didn't want windmills. The majority didn't want windmills." Another supervisor explained that he supported the 1500-foot setback because it was the most stringent in Iowa and he "thought it was fair to everybody."[1] As he testified, "[P]eople that did not want [wind] energy . . . were . . . expressing their views, and people that wanted to have it were expressing theirs, so we tried to pick something that was fair to everybody."

Based on our review of the summary judgment record, we find no basis for setting aside the Ordinance as approved by the county's elected legislative body. We hold that the district court did not err in granting summary judgment in favor of the defendants on the plaintiffs' claim that the Ordinance was void and unenforceable.

**B. Approval of the PAWE Wind Energy Project.**

The plaintiffs next contend that the Board's approval of the wind energy project violated the terms of the Ordinance and was arbitrary and capricious. As noted above, we do not get to decide the facts. Our portfolio is simply to determine whether substantial evidence supports the Board's findings. *See, e.g.*, *Bontrager Auto Serv.*, 748 N.W.2d at 495.

1. *The owner/developer issue.* The plaintiffs first claim that approval should not have been granted because PAWE and Invenergy, which submitted the request for approval, were not the "Owner/Developer" of the project. Section 3(e) of the ordinance defines "Owner/Developer" to

---

[1]*Cf. In re Application of Champaign Wind, LLC*, 58 N.E.3d 1142, 1153–54 (Ohio 2016) (upholding an agency determination that an appropriate minimum residential setback was 919 feet).

"mean the individual, firm, business or entity that intends to own and operate a Wind Energy Conversion System in accordance with this Ordinance." Section 4 requires any request for site plan and approval to be submitted by the "Owner/Developer." The plaintiffs argue that PAWE and Invenergy did not meet the requirements of the section 3(e) definition, because PAWE intended to transfer ownership of the project to MidAmerican and thus never intended to "operate" it.

We agree with the district court's resolution of this issue. Ordinances should be read as a whole. *See Ames 2304, LLC, v. City of Ames, Zoning Bd. of Adjustment*, ___ N.W.2d ___, ___ (Iowa 2019) ("Our court must consider a statute or ordinance 'in its entirety [and] not just [through] isolated words or phrases.' " (alterations in original) (quoting *State v. Romer*, 832 N.W.2d 169, 176 (Iowa 2016))). Section 9 authorizes a change in ownership of a wind project if the Board consents. It adds, "[S]uch consent shall not be unreasonably withheld." Hence, the Ordinance permits the initial owner of the wind project to transfer ownership to another entity with the consent of the Board. Nothing here limits the time period when this transfer may occur, so long as the Board consents.

Reading the Ordinance in its entirety, we conclude that an application would be compliant if filed by the party or parties that own the project at the time of the application, with disclosure of any anticipated future transfer. That occurred here. In their application, PAWE and Invenergy actually asked for advance approval to transfer the permit, agreements, and other project assets and interests to MidAmerican. The October 24, 2017 resolution conditionally approving the project does not reflect such an approval, but the point remains that MidAmerican's potential future ownership was made known. MidAmerican appeared

during the public proceedings and stated that it would purchase the development once it was complete and then manage construction of the project. Thus, the members of the Board were aware that MidAmerican could (and even likely would) take over ownership and operation of the project. We agree there was no violation of the ordinance.

We also find no merit in plaintiffs' argument that "due diligence to ensure that the proper entity is submitting the permit application" means MidAmerican must be the applicant so as to "be obligated to the county to be responsible for the requirements of the permit." It is undisputed that if MidAmerican took over the permit as an assignee, it would succeed to PAWE's legal obligations thereunder. *See TSB Holdings*, 913 N.W.2d at 16 ("An assignment occurs when an assignor transfers to its assignee 'the whole of any property or right in the property' such that 'the assignee assumes the rights, remedies, and benefits of the assignor,' and 'also takes the property subject to all defenses to which the assignor is subject.' " (quoting *Red Giant Oil Co. v. Lawlor*, 528 N.W.2d 524, 533 (Iowa 1995))).

In any event, substantial compliance with the Ordinance would have been sufficient here. *See Bontrager Auto Serv.*, 748 N.W.2d at 488; *Obrecht v. Cerro Gordo Cty. Zoning Bd. of Adjustment*, 494 N.W.2d 701, 703 (Iowa 1993). In *Obrecht*, a county zoning ordinance required that an application for special use be signed by the landowner. *Obrecht*, 494 N.W.2d at 703. The application had been signed by the lessee of the land, not the owner, but the owner appeared at the hearing and voiced no opposition. *Id.* at 702, 703. The owner was available to answer any questions. *Id.* at 703. We held that this was substantial compliance because "[t]he objectives of the owner filing requirement were more than satisfied." *Id.*

In similar fashion, there was substantial compliance with the Ordinance here. The current owner of the project submitted the

application with full disclosure of its plans to transfer ownership and operation to another entity. MidAmerican, the expected transferee, attended both the October 5 public hearing and the October 24 meeting at which the application was approved. MidAmerican was asked to speak at both meetings. The Board was aware of MidAmerican's anticipated role.

2. *DNR and the state archaeologist.* The plaintiffs next argue that the Board acted arbitrarily and capriciously in disregarding the recommendations of the DNR and the state archaeologist. The DNR provided letters of June 2016 and May 2017 that applied to potential wind projects in Clay, Kossuth, and Palo Alto Counties. In the letters, the DNR acknowledged that it "does not regulate wind farms." Nonetheless, the DNR recommended a one-mile buffer area between wind turbines and wildlife conservation and riparian areas as well as special measures to protect threatened and endangered species. It also recommended conducting pre- and post-construction surveys for birds and bats.

The office of the state archaeologist reviewed this specific wind project and shared its recommendations in a May 8, 2017 email. The office recommended that pre-construction surveys be performed by qualified archaeologists because of the possibility of unmarked graves or cemeteries.

The undisputed record indicates that the Board reviewed these recommendations but elected not to follow them. One supervisor testified that "these were recommendations that we looked at" but they were "just too stringent on some of this." Another supervisor confirmed that the Board "reviewed their information." Yet another supervisor explained that the Board talked to the County's own conservation director about environmental issues. We agree with defendants that the summary judgment record fails to show the Board acted arbitrarily or capriciously.

3. *The noise issue.* The plaintiffs also urge that the Board acted illegally, arbitrarily, and capriciously in disregarding a submission from an acoustical expert. According to the plaintiffs, this showed that the project would at times exceed the maximum permissible fifty-decibel noise level as measured at the exterior wall of any residential building.

As part of their application, PAWE and Invenergy submitted a detailed noise analysis. That analysis predicted sound levels at each permanent residence (a total of 268 receptor points). It assumed (1) full simultaneous operation of all 198 turbines (even though no more than 170 would actually be operational), (2) the maximum noise emission value provided by the manufacturer for each turbine, (3) completely reflective ground, and (4) the lowest degree of atmospheric absorption—i.e., a set of conditions that would produce the greatest noise. Using these assumptions, PAWE and Invenergy's analysis projected noise levels of 27.4 decibels to 49.9 decibels.

The report cited by plaintiffs from E-Coustic Solutions did not make an independent prediction of noise levels. Instead, it simply *reanalyzed* the work of PAWE and Invenergy's expert by pointing out that wind turbines can have noise levels fluctuating by plus or minus five decibels. Thus, according to this expert, a projected noise level of no more than forty-five to fifty decibels could result in some instances where noise actually exceeds fifty decibels.

Once again, we are not persuaded that the Board acted illegally, arbitrarily, or capriciously. The record does not indicate that the Board of Supervisors ignored E-Coustic's expert submission. To begin with, as noted by the district court, PAWE and Invenergy's analysis was predicated on a series of pessimistic assumptions. And according to the Ordinance,

the fifty-decibel maximum only applied "under normal operating conditions."

Regardless, Board members testified that they relied on the fact that the Ordinance imposed a *maximum.* If PAWE and Invenergy's predictions were off, they would still be legally obligated to reduce the noise. As one supervisor put it, "[U]ntil you put in the project and see what the noise level is, there's no way of knowing. And with us having in place a decibel limit . . . I'm comfortable with that." Another supervisor commented, "[I]f they don't meet the ordinance they're not in compliance, so . . . there would be consequences."

4. *Decommissioning cost.* Lastly, the plaintiffs insist that the Board acted illegally, arbitrarily, and capriciously in accepting PAWE and Invenergy's $33,480 per-turbine cost figure for decommissioning. The Ordinance requires each application for permit to include a decommissioning plan "outlining the anticipated means and cost of removing each Wind Energy Device at the end of its serviceable life or upon becoming a discontinued use." The Ordinance further requires the cost estimate to be performed by a professional engineer licensed in Iowa, and it requires the owner/developer to enter into a binding decommissioning and removal agreement.

PAWE and Invenergy complied with these provisions. A licensed Iowa professional engineer prepared their decommissioning plan. PAWE and Invenergy entered into a binding agreement to decommission and remove the wind turbines and any other structures associated with the wind project and restore the ground cover. As mandated by the Ordinance, PAWE promised to provide a bond in the amount of $5,691,655 ($33,480 times 170 wind turbines). It also promised to bear any additional expenses of turbine decommissioning and removal. These obligations would be

assumed by MidAmerican if ownership of the project were transferred to it.

The plaintiffs argue that the Board "gave no consideration to the probability that the decommissioning would be underfunded." They cite to an email that the supervisors received from a business professor at Clarke University in Dubuque urging that the cost of removal is presently closer to $200,000 per turbine. But this individual was not a licensed engineer and was merely relaying information from another study relating to another project in another state. His email made it clear that he was not a supporter of wind farms: "This whole industry is a giant tax credit program for the companies putting them up. They have virtually zero effect on carbon emissions and produce little energy that is astronomical in terms of cost—government subsidies are propping the whole industry."

We do not find the Board acted improperly in relying on the only cost estimate that came from a licensed professional engineer. *See Perkins*, 636 N.W.2d at 67 ("We will uphold the action of the Board of Supervisors if it is supported by competent and substantial evidence."). Furthermore, under the decommissioning agreement, PAWE and Invenergy committed to updating the decommissioning plan annually and to increasing the bond "[i]f an updated Decommissioning Plan indicates a Decommissioning cost greater than $33,480.00 per turbine."

## IV. Conclusion.

For the foregoing reasons, we affirm the judgment of the district court. As this case reveals, wind farms are not without drawbacks. But in this case the weighing of those drawbacks against any benefits was entrusted to the elected representatives on the Palo Alto County Board of Supervisors.

**AFFIRMED.**