IN THE SUPREME COURT OF IOWA
No. 22–0401
Submitted September 14, 2023—Filed February 23, 2024

**SENATOR ROBY SMITH, SENATOR JIM CARLIN, SENATOR CHRIS COURNOYER, SENATOR ADRIAN DICKEY, SENATOR JASON SCHULTZ, SENATOR DAN ZUMBACH, FORMER SENATOR ZACH WHITING, REPRESENTATIVE BROOKE BODEN, REPRESENTATIVE BOBBY KAUFMANN, REPRESENTATIVE CARTER NORDMAN,** and **REPRESENTATIVE JEFF SHIPLEY,**

Plaintiffs,

vs.

**IOWA DISTRICT COURT FOR POLK COUNTY,**

Defendant.

Appeal from the Iowa District Court for Polk County, Sarah Crane, Judge.

Nonparty legislators seek a writ of certiorari to quash subpoenas issued to them in underlying litigation challenging recent election legislation on the basis of a legislative evidentiary privilege. **PETITION FOR WRIT OF CERTIORARI GRANTED; WRIT SUSTAINED.**

Oxley, J., delivered the opinion of the court, in which all justices joined.

Brenna Bird, Attorney General; Samuel P. Langholz (until withdrawal), Chief Deputy Attorney General; W. Charles Smithson, Legal Counsel and Secretary of the Senate; and Eric H. Wessan (argued), Solicitor General, for plaintiffs.

David R. Fox (argued), Uzoma N. Nkwonta, Melinda K. Johnson, William K. Hancock, Alexander F. Atkins, and John M. Geise (until withdrawal), of Elias Law Group LLP, Washington, D.C.; and Shayla McCormally of McCormally & Cosgrove, PLLC, Des Moines, and for defendant.

Alan R. Ostergren of Alan R. Ostergren, PC, Des Moines, for amici curiae Republican National Committee, National Republican Senatorial Committee, National Republication Congressional Committee, and Republican Party of Iowa.

**OXLEY, Justice.**

In an effort to support its constitutional challenges to recent legislative changes to voting procedures, the League of Latin American Citizens of Iowa (LULAC) served subpoenas on several Iowa legislators, seeking discovery of communications the legislators had with third parties related to enactment of the legislation. The legislators, who were not parties to the underlying litigation, objected to the subpoenas, LULAC filed a motion to compel, and the district court granted the motion in part. The nonparty legislators filed a petition for writ of certiorari, arguing they are protected from compelled document production by a legislative privilege under the Iowa Constitution.

This certiorari proceeding presents our first opportunity to address whether the Iowa Constitution—which lacks a speech or debate clause—nonetheless supports a legislative privilege that protects Iowa legislators from compelled production of documents related to the passage of legislation. The district court concluded that the Iowa Constitution provides a privilege, but the privilege is conditional rather than absolute. It then concluded that compelling, competing interests—specifically LULAC's claims that the legislation amounts to unconstitutional viewpoint discrimination—require piercing the privilege with respect to most of the documents sought in the underlying litigation.

We now hold that the Iowa Constitution contains a legislative privilege that protects legislators from compelled document production and that the privilege extends to communications with third parties where the communications relate directly to the legislative process of considering and enacting legislation. However, we need not, and therefore do not, decide whether the legislative privilege is absolute or qualified. The district court applied the wrong analysis when it relied on gerrymandering cases, where some courts hold that "judicial inquiry into legislative intent is specifically contemplated as part of the resolution of the

core issue that such cases present." *Bethune-Hill v. Va. State Bd. of Elections*, 114 F. Supp. 3d 323, 337 (E.D. Va. 2015). The district court should have considered the underlying claims—which challenge changes to the voting procedures as violating individual voters' constitutional rights—through the lens of the *Anderson-Burdick* balancing test. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). That test balances the "character and magnitude" of the injury to the individual voters' rights against the state's justification for the changes, *Anderson*, 460 U.S. at 789, neither of which turn on legislative intent. Therefore, the individual legislators' intent has little, if any, relevance to LULAC's claims. Whether absolute or qualified, the legislative privilege protects the legislators from the requested document production.

## I. Background Facts and Proceedings.

The League of Latin American Citizens of Iowa (LULAC) is part of the largest and oldest Latino civil rights organization in the United States, with more than 600 members in Iowa alone. In March of 2021, LULAC sued the Iowa Secretary of State and the Iowa Attorney General, challenging several provisions of two recently enacted state election laws under the Iowa Constitution. The challenged provisions shorten the time for voters to register, shorten the time to request and send absentee ballots, alter ballot receipt deadlines, limit who can return absentee ballots on behalf of another, and reduce polling place hours on election day, among other changes. *See* 2021 Iowa Acts chs. 12, 147 (codified at scattered sections of Iowa Code 2022). LULAC alleges the provisions, individually or collectively, are targeted at voters based on their political views and impose an unconstitutional burden on their members' rights to vote, violate free speech protections, violate equal protection by subjecting absentee voters to arbitrary and disparate treatment, and amount to intentional viewpoint discrimination in

violation of free speech and equal protection. LULAC seeks declaratory and injunctive relief prohibiting enforcement of both statutes.

That case proceeded to discovery, which is where this certiorari action begins. In November and December of 2021, LULAC served third-party subpoenas on several nonparty state legislators, including Senators Jim Carlin, Chris Cournoyer, Adrian Dickey, Jason Schultz, Roby Smith, and Dan Zumbach; former senator Zach Whiting; and Representatives Brooke Boden, Bobby Kaufmann, Carter Nordman, and Jeff Shipley (collectively "Legislators"). The subpoenas sought production of meeting documents and communications related to the Legislators' consideration and enactment of the challenged election laws, including the proffered justifications for enactment and the prevalence or absence of voter fraud in Iowa elections. The subpoenas specifically limited the requests to documents from meetings or communications with "non-Legislators," defined in the subpoenas to exclude current members of the general assembly, their predecessors, successors, employees, staff, agents, and representatives.

The Legislators objected to LULAC's requests, asserting that legislative privilege and third-party privacy interests under article I, section 20 of the Iowa Constitution protect them from responding. LULAC filed a motion to compel, arguing that communications with third parties outside of the legislature were not protected by a legislative privilege, to the extent one even exists under Iowa law. Alternatively, LULAC argued that if a legislative privilege exists, it is qualified, and the important constitutional rights at stake require abrogating the privilege in this case. After a hearing held on January 21, 2022, the district court granted LULAC's motion to compel, in large part.

The district court concluded that a legislative privilege exists under Iowa law, the privilege applies to the requested external communications, and its protection extended to the documents being sought by the subpoenas. Nonetheless,

the court held that the privilege is qualified and that it must give way to LULAC's interests in this case where the privilege's underlying purposes are outweighed by a compelling, competing interest. The court found that discovery into individual legislators' intent is "highly relevant" to LULAC's First Amendment claim, which challenges the law-making process itself by alleging the election laws were enacted to impose unjustified barriers on Latino voters' ability to vote and participate in the political process. The court rejected the Legislators' argument that individual legislators' intent is irrelevant to interpretation of a statute because the claim turned on the reason for enactment, not the meaning of the enacted legislation. The court ordered the Legislators to comply with most of the subpoenas' requests, but it denied LULAC's motion to compel to the extent it sought the Legislators' work product that had not been subject to communications with nonlegislators. The court entered a protective order to maintain the confidentiality of documents produced in discovery.

On March 2, 2022, the Legislators filed a petition for writ of certiorari to challenge the discovery order, which we granted.[1]

## II. Standard of Review.

We review discovery rulings by the district court for abuse of discretion. *Jones v. Univ. of Iowa*, 836 N.W.2d 127, 139 (Iowa 2020). "An abuse of discretion consists of a ruling which rests upon clearly untenable or unreasonable grounds." *Id.* (quoting *Lawson v. Kurtzhals*, 792 N.W.2d 251, 258 (Iowa 2010)). However, the Legislators' claim that the ruling violates the Iowa Constitution is

---

[1]The Republican Party of Iowa and various Republican National Committees intervened in the underlying litigation, and LULAC served discovery on those parties seeking similar information. The district court's order also addressed LULAC's motion to compel discovery over the intervenors' objections to the discovery requests, granting in part and denying in part LULAC's motion to compel. This certiorari proceeding is limited to the nonparty Legislators' challenge to the district court's order directed to them. The intervenors filed an amicus brief supporting the Legislators' position in this proceeding.

reviewed de novo. *Klouda v. Sixth Jud. Dist. Dep't of Corr. Servs.*, 642 N.W.2d 255, 260 (Iowa 2002).

### III. Analysis.

This case presents our court with the first opportunity to determine whether a legislative privilege exists under Iowa law. Initially, we note there is no authority in Iowa that explicitly grants a legislative privilege. The Legislators (and their amici) urge us to find that an absolute legislative privilege exists premised on principles of separation of powers and article I, section 20 of the Iowa Constitution, which protects "[t]he people['s] . . . right . . . [to] make known their opinions to their representatives." LULAC contends that even if we find that some form of legislative privilege exists in Iowa, the district court did not abuse its discretion because it correctly determined that the privilege is qualified and should be abrogated in this case. We begin our analysis by addressing the existence of a legislative privilege under Iowa law.

**A. The Iowa Constitution Provides a Legislative Privilege.** The Legislators assert they are exempted from responding to LULAC's subpoena for documents related to their legislative duties under a legislative privilege. The legislative privilege the Legislators rely on is an evidentiary privilege that protects legislators "against both compulsory testimony and compulsory production of evidence." *Edwards v. Vesilind*, 790 S.E.2d 469, 478 (Va. 2016); *see also Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 418, 420–21 (D.C. Cir. 1995) ("A party is no more entitled to compel congressional testimony—or production of documents—than it is to sue congressmen."). It is often invoked to prevent "evidence of legislative acts from being used against legislators in proceedings." *U.S. EEOC v. Wash. Suburban Sanitary Comm'n*, 666 F. Supp. 2d 526, 531 (D. Md. 2009); *see also United States v. Johnson*, 383 U.S. 169, 182–

85 (1966) (addressing legislative privilege in criminal proceedings against senator).

A legislative privilege "is a derivative of legislative immunity." *Wash. Suburban Sanitary Comm'n*, 666 F. Supp. 2d at 531 (addressing the differences between legislative immunity and legislative privilege). While legislative privilege derives from legislative immunity, they are distinct, and it is important to recognize that distinction. *See Am. Trucking Ass'ns v. Alviti*, 14 F.4th 76, 86 n.6 (1st Cir. 2021) ("[F]ollowing the Supreme Court's lead in *United States v. Gillock*, 445 U.S. 360, 368–73, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980), we use 'immunity' only when discussing potential liability and 'privilege' only when referring to evidentiary issues."). "Legislative *immunity* . . . protects legislators from suit arising from their legitimate legislative actions." *Wash. Suburban Sanitary Comm'n*, 666 F. Supp. 2d at 531 (emphasis added). Where it applies, it is absolute—protecting legislators not only from civil liability but also from being sued in the first place. *See Dombrowski v. Eastland*, 387 U.S. 82, 84–85 (1967) (per curiam) ("[L]egislators engaged 'in the sphere of legitimate legislative activity,' should be protected not only from the consequences of litigation's results but also from the burden of defending themselves." (citation omitted)). Legislative *privilege* is an evidentiary privilege that serves to protect a legislator from being required to produce documents or testify in court proceedings. It may arise in situations like here where the legislator is not a party to the underlying suit. *See Am. Trucking*, 14 F.4th at 88, 90–91 (granting writ of mandamus to nonparty state officials seeking to quash subpoena issued in a case challenging the constitutionality of a state statutory scheme under the dormant Commerce Clause).

The Legislators urge us to equate the absolute legislative immunity we have previously recognized to an absolute legislative privilege. In *Teague v.*

*Mosely*, we recognized that absolute immunity can protect local officials from civil liability where county supervisors were sued for allegedly failing to provide safe conditions after an inmate was assaulted in a county jail. 552 N.W.2d 646, 649 (Iowa 1996).

> When officials are threatened with personal liability for acts taken pursuant to their official duties, they may well be induced to act with an excess of caution or otherwise to skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct. In this way, exposing government officials to the same legal hazards faced by other citizens may detract from the rule of law instead of contributing to it.

*Id.* (quoting *Forrester v. White*, 484 U.S. 219, 223 (1988)). But we were also careful to limit the immunity to officials acting in a legislative capacity, as opposed to an administrative capacity, because "immunity [from liability] is justified and defined by *the functions* it protects and serves, not by the person to whom it attaches." *Id.* (quoting *Forrester*, 484 U.S. at 227). Facing civil liability is far different from being forced to turn over documents, particularly when the legislator is not even a party to the suit and does not face personal liability.

Given the distinction between immunity and privilege, we proceed to consider the origins of legislative immunity and its derivative legislative privilege to determine whether a legislative privilege exists under the Iowa Constitution.

In the federal system, legislative immunity derives from the United States Constitution's Speech or Debate Clause, which provides:

> Senators and Representatives . . . shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses . . . ; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

U.S. Const. art. I, § 6. The roots of the Speech or Debate Clause can be traced back to political problems in the English Parliament, predating the United States Constitution. *See Tenney v. Brandhove*, 341 U.S. 367, 372 (1951) ("The privilege

of legislators to be free from arrest or civil process for what they do or say in legislative proceedings has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries."). "England's experience with monarchs exerting pressure on members of Parliament by using judicial process to make them more responsive to their wishes led the authors of our Constitution to write an explicit legislative privilege into our organic law." *Gillock*, 445 U.S. at 368–69. "[T]he purpose of this clause was 'to prevent intimidation (of legislators) by the executive and accountability before a possibly hostile judiciary.'" *Powell v. McCormack*, 395 U.S. 486, 502 (1969) (quoting *Johnson*, 383 U.S. at 181); *see also Doe v. McMillan*, 412 U.S. 306, 311, 316 (1973) (stating that the Clause aims to prevent intimidation of legislators by the Executive or a possibly hostile judiciary). Thus, the separation-of-powers doctrine is an important rationale underlying the Speech or Debate Clause. *Gillock*, 445 U.S. at 369–70.

While the legislative immunity doctrine that is derived from the Speech or Debate Clause protects members of Congress from facing civil *liability*, federal courts recognize that an additional *evidentiary privilege* stems from the doctrine as well. *See Johnson*, 383 U.S. at 180–85 (holding that federal prosecutors could not question a senator about a speech he gave on the House floor that helped form the basis for bribery charges against him). To safeguard "legislative immunity and to further encourage the republican values it promotes," courts have recognized a corresponding privilege "against compulsory evidentiary process" that can be applied "whether or not the legislators themselves have been sued." *EEOC v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011). In other words, the evidentiary privilege helps protect the legislative immunity granted by the Speech or Debate Clause.

Identifying the exact source of the evidentiary privilege is complicated. The United States Supreme Court has recognized that the "last sentence of the

[Speech or Debate] Clause provides Members of Congress with two distinct privileges." *Gravel v. United States*, 408 U.S. 606, 614 (1972). Recall that that sentence provides that congressmembers are "privileged from Arrest during their Attendance at the Session of their respective Houses," and that they "shall not be questioned in any other Place" "for any Speech or Debate in either House." U.S. Const. art. I, § 6. Immunity from civil liability (and from being sued) stems largely from the first part of the Speech or Debate Clause's privilege against arrest, *see Gravel*, 408 U.S. at 614, although courts have also recognized that the "shall not be questioned" protection does some work to make the immunity absolute, *see, e.g., Am. Trucking*, 14 F.4th at 86–87 (quoting only the second part of the Clause in identifying the source for absolute legislative immunity from suit).

The protection from being "questioned in any other Place," U.S. Const. art. I, § 6, has been read as the source of the evidentiary privilege based on the recognition that "[t]he Speech or Debate Clause was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch," *Gravel*, 408 U.S. at 616 (finding the Speech or Debate Clause exempted a senator from answering questions about occurrences during a congressional subcommittee meeting); *see also Edwards*, 790 S.E.2d at 477 (addressing identical clause in the Virginia Constitution and concluding that "[t]he term 'questioned' should be understood broadly to mean 'subjected to examination by another body' "). Thus, while the legislative privilege helps protect the legislative immunity provided by the Federal Speech or Debate Clause, courts have relied on the "shall not be questioned" portion of the Clause to identify the source for the evidentiary privilege.

The Speech or Debate Clause by its express terms applies only to congresspersons, not state legislators. Nonetheless, federal courts have recognized

that the federal common law provides a similar legislative immunity that protects state and local lawmakers from civil liability for actions taken in their legislative capacities. *See Tenney*, 341 U.S. at 376 (holding that state legislators were entitled to absolute immunity from suit under federal common law and concluding that in enacting 42 U.S.C. § 1983 Congress did not, without more specific language, intend § 1983 liability to "impinge on a tradition so well grounded in history and reason"); *see also Bogan v. Scott-Harris*, 523 U.S. 44, 49–52 (1998) (extending absolute immunity to local legislators).

While federal common law provides absolute legislative *immunity* to state lawmakers, the accompanying *evidentiary privilege* is qualified. *See Doe v. Pittsylvania County*, 842 F. Supp. 2d 906, 920 (W.D. Va. 2012) ("In contrast to the privilege enjoyed by members of Congress under the Speech or Debate Clause, there is no absolute 'evidentiary privilege for state legislators [in federal prosecutions] for their legislative acts.' Nor has the Court recognized an absolute testimonial privilege for state or local legislators in civil cases." (citation omitted) (quoting *Gillock*, 445 U.S. at 373)). The distinction stems from principles of federalism and the federal government's supremacy over the states. *See Gillock*, 445 U.S. at 369–70. Whereas separation-of-powers principles demand that the federal judiciary treat the federal legislature as a coequal branch of government, the Supremacy Clause in article VI, section 2 of the United States Constitution gives the federal judiciary greater license to interfere with state legislative functions when necessary to protect federal interests. "That is because the separation-of-powers rationale underpinning the Speech or Debate Clause does not apply when it is a state lawmaker claiming legislative immunity or privilege [in federal court]." *Am. Trucking*, 14 F.4th at 87 (recognizing nonetheless that "federal courts will often sustain assertions of legislative privilege by state

legislatures except when 'important federal interests are at stake,' such as in a federal criminal prosecution" (quoting *Gillock*, 445 U.S. at 373)).

State courts have also addressed legislative privilege under their respective state constitutions. Forty-three states have adopted a speech or debate clause into their state constitutions modeled directly after the Federal Clause. *See Developments in the Law—Privileged Communications*, 98 Harv. L. Rev. 1450, 1615 n.129 (1985) (noting that since *Tenney v. Brandhove*, which identified forty-one states with identical speech or debate clauses, Alaska and Hawaii were admitted to the union and adopted the full protection of the federal speech or debate clause). Notably, the Iowa Constitution does not have a speech or debate clause, a point LULAC relies on to argue that the Iowa Constitution does not provide a legislative privilege. However, article III, section 11 of the Iowa Constitution does provide some of the same protections: "Senators and Representatives, in all cases, except treason, felony, or breach of the peace, shall be privileged from arrest during the session of the General Assembly, and in going to and returning from the same." Nonetheless, we cannot ignore that while our constitution includes the privilege against arrest, it omits the "shall not be questioned in any other place" language included in the Federal Speech or Debate Clause and that of forty-three other states. Notably, the United States Supreme Court noticed the missing "shall not be questioned" provision from our constitution, *see Tenney*, 341 U.S. at 375 n.5 (noting forty-one states have the same protection as the Federal Speech or Debate Clause; five states, including Iowa have only a "freedom from arrest" provision; and only Florida provides no constitutional privileges for its legislators), as has the Iowa Attorney General, *see* 1979 Op. Iowa Att'y Gen. 174 (1980) ("Noticeably absent from the Iowa constitutional scheme is a provision ensuring that legislators will not be held accountable in any other tribunal or place for their speeches and debates."). *See*

*also* Steven F. Huefner, *The Neglected Value of the Legislative Privilege in State Legislatures*, 45 Wm. & Mary L. Rev. 221, 236–37, 237 n.54 (2003) (identifying Iowa as one of "seven states entirely without any constitutional language granting the [legislative] privilege").

Although many state courts have found a broad legislative privilege under their state constitutions, we must be cautious in following those state courts, given the differences between their constitutional language compared to ours. For instance, the Supreme Court of Virginia held that legislators enjoyed absolute legislative privilege with respect to communications made "within the legislative sphere" between legislators and their staff or "alter egos." *Edwards*, 790 S.E.2d at 482–83 (reversing the circuit court in part, noting that it could not "speculate as to potentially privileged communications involving third parties" given the early stages of discovery). The *Edwards v. Vesilind* court relied on "[t]he term 'questioned' " in its speech or debate clause, giving it a broad application in concluding the privilege was absolute, where it applied. *Id.* at 477. Similarly, Maryland's highest court found a broad legislative privilege stemmed, at least in part, from article 10 of the Maryland Declaration of Rights, providing "[t]hat freedom of speech and debate, or proceedings in the Legislature, ought not to be impeached in any Court of Judicature," to quash a subpoena seeking documents and testimony from legislators related to drafting redistricting plans. *In re 2022 Legis. Districting of the State*, 282 A.3d 147, 193–98 (Md. 2022) (quoting Md. Const. Declaration of Rights art. 10). While the majority in that opinion did not characterize the privilege as absolute, one dissent recognized it as such. *Id.* at 233 (Getty, C.J., dissenting).

Yet the missing protection against "being questioned" from article III, section 11 of the Iowa Constitution does not mean there is no legislative privilege. Florida is one of two states lacking any legislative protections in its constitution.

Despite "the absence of a Speech or Debate Clause and the strong public policy . . . favoring transparency and public access to the legislative process," the Florida Supreme Court still found a legislative privilege exists. *League of Women Voters of Fla. v. Fla. House of Representatives,* 132 So. 3d 135, 144–45 (Fla. 2013). It relied on the doctrine of separation of powers, a doctrine expressly included in the Florida Constitution. *Id.* ("[The] privilege is based on the principle that 'no branch may encroach upon the powers of another,' and on inherent principles of comity that exist between the coequal branches of government." (citation omitted) (quoting *Chiles v. Children A, B, C, D, E, & F,* 589 So. 2d 260, 264 (Fla. 1991))). The court clarified the privilege was not absolute, however, and "may yield to a compelling, competing interest." *Id.* at 143.

Turning to our constitution, we conclude that three provisions of the Iowa Constitution support recognizing a legislative privilege: article III, section 1, which expressly provides for separation of powers between the three branches of government; article III, section 11, which gives senators and representatives a "privilege[] from arrest during the session of the general assembly;" and article I, section 20, which protects "[t]he people['s] . . . right . . . [to] make known their opinions to their representatives." Iowa Const. art. I, § 20; *id.* art III, §§ 1, 11. The principles behind separation of powers are evident in most discussions of legislative privilege. *See, e.g., Edwards,* 790 S.E.2d at 476 ("Legislative privilege arose in the young American nation from the same underlying principles [of freedom of speech and legislative immunity in parliamentary law], combined with the uniquely American emphasis on separation of powers and representative government."); *League of Women Voters of Fla.,* 132 So. 3d at 144 ("These factors, however, are not conclusive because there is another important factor that weighs in favor of recognizing the privilege—the doctrine of separation of powers."). Even though the United States Constitution lacks an express separation-

of-powers provision, federal courts still recognize that the Speech or Debate Clause is one facet of a larger separation-of-powers design. *See United States v. Brewster*, 408 U.S. 501, 508 (1972) ("Our speech or debate privilege was designed to preserve legislative independence, not supremacy.").

As we already noted, article III, section 11's protection against arrest serves a similar purpose as the Speech or Debate Clause, even absent the "questioned in any other place" clause. *See id.* at 521 ("We recognize that the privilege against arrest is not identical with the Speech or Debate privilege, but it is closely related in purpose and origin."); *Powell*, 395 U.S. at 503–05 (explaining that the arrest clause ensures "that legislators are free to represent the interests of their constituents" without risk of being taken to court). "The immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators." *Brewster*, 408 U.S. at 507. In the same way, article III, section 11 enables legislators to exercise their constitutional duties free from threats to their personal liberty that could unduly affect the legislative decision-making process.

Finally, article I, section 20 reinforces our conclusion that the Iowa Constitution includes a legislative privilege. *See* Iowa Const. art. I, § 20 (protecting the right of the people "to assemble together to counsel for the common good; to make known their opinions to their representatives and to petition for a redress of grievances"). This provision expresses the importance our constitution places on legislators' role in our tripartite system of government to act as their constituents' voices. *See Knorr v. Beardsley*, 38 N.W.2d 236, 245 (Iowa 1949) ("The people, then, have vested *the* legislative authority *inherent in them*, in the general assembly."). It also emphasizes the significance of citizen involvement in the legislative process. *See Mathis v. Palo Alto Cnty. Bd. of*

*Supervisors*, 927 N.W.2d 191, 196 (Iowa 2019) (citing article I, section 20 as authority for the proposition that "[l]obbying our government is every citizen's constitutional right"). The people's ability to communicate with their elected representatives is vital to the effective exercise of legislative functions. The protection of citizens' role in the legislative process helps ensure the separation of powers and supports finding a legislative privilege that limits the unelected judicial branch's power to interfere with elected representatives' performance of official duties. *See, e.g.*, *League of Women Voters of Fla.*, 132 So. 3d at 146 (recognizing a legislative privilege to "ensure that the separation of powers is maintained so that the Legislature can accomplish its role of enacting legislation in the public interest without undue interference"). We conclude from these provisions, taken together, that a legislative privilege inherently flows from the Iowa Constitution.

**B. The Scope of the Legislative Privilege Under the Iowa Constitution Extends to Communications with Third Parties Related to Consideration and Enactment of Legislation.** We next consider the scope of the legislative privilege. LULAC intentionally limited the subpoenaed documents to communications with third parties in an attempt to avoid infringing on the legislative process. The requested communications must fall within the scope of the legislative privilege to be protected, regardless of whether the privilege is absolute or qualified.

The requested documents here relate directly to enacting legislation, so from that perspective, they are legislative in nature. The United States Supreme Court has explained that conduct falls within the legitimate legislative sphere when the activities are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings

with respect to the consideration and passage or rejection of proposed legislation." *Gravel*, 408 U.S. at 625; *see also Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) ("[T]he power to investigate is inherent in the power to make laws because '[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change.'" (alteration in original) (quoting *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927))).

But LULAC limited its requests to communications with third parties outside the legislators' immediate circle of advisors. Recent federal appellate court decisions have concluded that the legislative privilege under federal common law protects communications between state legislators and outside third parties. In *In re North Dakota Legislative Assembly*, the United States Court of Appeals for the Eighth Circuit held that "[c]ommunications with constituents, advocacy groups, and others outside the legislature are a legitimate aspect of legislative activity. The use of compulsory evidentiary process against legislators and their aides to gather evidence about this legislative activity is thus barred by the legislative privilege." 70 F.4th 460, 464 (8th Cir. 2023). The Fifth Circuit similarly held that state legislators' communications with third parties were protected from discovery after finding that the legislative privilege was not waived merely because the requested information had been communicated outside the legislature: "An exception for communications 'outside the legislature' would swallow the rule almost whole, because '[m]eeting with "interest" groups . . . is a part and parcel of the modern legislative procedures through which legislators receive information possibly bearing on the legislation they are to consider.'" *La Union Del Pueblo Entero v. Abbott*, 68 F.4th 228, 236 (5th Cir. 2023) (alteration and omission in original) (quoting *Bruce v. Riddle*, 631 F.2d 272, 280 (4th Cir. 1980)). While the court acknowledged that the legislative privilege could be waived in

certain circumstances—such as when legislators publicly reveal the information—it was not waived there because "the legislators did not send privileged documents to third parties *outside* the legislative process; instead they brought third parties *into* the process." *Id.* at 236–37.

On the other hand, the Supreme Court of Virginia has limited the scope of its constitution's legislative privilege to communications with only those third parties who act as the agent, or alter ego, of the legislator. *See Edwards*, 790 S.E.2d at 481. *Edwards* addressed whether communications with individuals beyond a legislator's paid staff fell within the absolute privilege protected by the Virgina speech or debate clause. *Id.* at 481–82. The court held that communications between legislators and consultants or constituents were protected as long as they met an alter ego test: "Provided the legislator has requested the constituent or third party's assistance in the performance of a legislative act, the privilege applies to that individual as much as to any other alter ego." *Id.* at 483. The court went on to limit its holding, explaining: "However, unsolicited communications and acts taken by the constituent or third party on his or her own initiative will not satisfy this test, even when closely connected to legitimate legislative activity." *Id.*

Our reliance on article I, section 20, protecting citizens' involvement in the legislative process, as supporting recognition of a legislative privilege leads us to adopt the reasoning of the federal courts and conclude that the protection provided to the Legislators' communications with third parties is not limited to only those third parties acting as the Legislators' agents. If the legislative privilege extended only to individuals whom a legislator has asked to act on her behalf, a citizens' unsolicited communications to his legislator about specific legislation would fall outside the legislative privilege. The subject of the communication is what provides the limiting principle.

LULAC's subpoenas target communications containing information about the enactment and consideration of the election legislation. Because the Legislators engaged in and received those communications "with respect to the consideration and passage or rejection of proposed legislation," *Gravel*, 408 U.S. at 625, the information falls within the sphere of legislative activity regardless of whether it originated from persons outside the legislature. Therefore, we conclude that the Legislators' communications with third parties regarding the election legislation fall within the scope of the legislative privilege.

**C. The Requested Communications Are Not Relevant to LULAC's Claims and Are Therefore Protected by the Legislative Privilege.** The Legislators urge us to apply an absolute legislative privilege, under which our analysis would stop once we conclude that the requested discovery falls within its protection. LULAC argues that to the extent we recognize a privilege, we should affirm the district court's application of a qualified privilege and conclude that the need for the discovery outweighs the privilege. LULAC asserts that the Legislators' communications with third parties will provide evidence that the election legislation was enacted to intentionally discriminate against its members based on their viewpoints. However, delving into the motive or purpose of individual legislators to determine the constitutionality of legislative action is confined to cases where such inquiry is required by the very nature of the constitutional question presented. *See, e.g., United States v. O'Brien,* 391 U.S. 367, 382–83 (1968) (rejecting defendant's argument—that "the 1965 Amendment is unconstitutional as enacted" since Congress's purpose in implementing the law was "to suppress freedom of speech"—because "under settled principles the purpose of Congress, as [defendant] uses that term, is not a basis for declaring this legislation unconstitutional") Therefore, we must carefully consider how the requested communications fit into LULAC's underlying claims.

We believe the district court applied the wrong framework to LULAC's claims. As we explain, an individual legislator's intent is not relevant when LULAC's claims are considered under the proper framework, and the legislative privilege therefore precludes the requested production even if we recognized only a qualified privilege. We need not, and do not, decide whether the legislative privilege we adopt today is qualified or absolute. Either way, it protects the Legislators in this case.

The district court rightly rejected the Legislators' argument that the views of individual legislators are irrelevant to legislative intent in the context of statutory interpretation, noting that count IV of LULAC's petition was "not based on the interpretation of the statutes" but was a challenge to "the law-making process itself." Instead, the district court applied a First Amendment free speech framework to conclude that legislative intent is relevant to count IV, asserting intentional viewpoint discrimination. The district court relied on *Shapiro v. McManus* as recognizing that laws enacted with " 'the purpose and effect of burdening a group of voters' representational rights' can be analyzed within the framework of [the] First Amendment's free speech protections." (Quoting *Shapiro*, 203 F. Supp. 3d 579, 596 (D. Md. 2016).) Because that free speech analysis requires the challenging parties to produce evidence of specific intent, the district court concluded that the requested documents would shed light on legislative intent, making it highly relevant to LULAC's claim and leading the district court to grant the motion to compel.

The district court's reliance on *Shapiro* is misplaced. *Shapiro* was a redistricting case where the asserted injury was vote dilution based on political party. 203 F. Supp. 3d at 598. Initially, we note that *Shapiro* is a legal dead-end. The United States Supreme Court subsequently held that the political gerrymandering challenge to Maryland's congressional redistricting that was raised in *Shapiro*

presented a nonjusticiable political question. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2506–07 (2019) ("We conclude that partisan gerrymandering claims present political questions beyond the reach of the federal courts. Federal judges have no license to reallocate political power between the two major political parties, with no plausible grant of authority in the Constitution, and no legal standards to limit and direct their decisions.").

Putting that legal hurdle aside, even racial gerrymandering cases like *Bethune-Hill v. Virginia State Board of Elections* raise significantly different issues than those posed by the election legislation challenged in this case. Some courts have stated that "[r]edistricting litigation presents a particularly appropriate circumstance for qualifying the state legislative privilege because judicial inquiry into legislative intent is specifically contemplated as part of the resolution of the core issue that such cases present." *Bethune-Hill*, 114 F. Supp. 3d at 337; *see also League of Women Voters of Fla.*, 132 So. 3d at 147 (concluding the legislative privilege was outweighed by the "compelling, competing interest [of] ensuring compliance with article III, section 20(a) [of the Florida constitution], which specifically outlaws improper legislative 'intent' in the congressional reapportionment process"); *cf.* J. Pierce Lamberson, Note, *Drawing the Line on Legislative Privilege: Interpreting State Speech or Debate Clauses in Redistricting Litigation*, 95 Wash. U. L. Rev. 203, 203 (2017) (recognizing "that [state] Speech or Debate Clause protections [are being] watered down in the redistricting context" and advocating for use of independent commissions for redistricting to avoid "weaken[ing] Speech or Debate Clause protections"). And even then, some federal courts applying the federal common law legislative privilege have rejected "call[s] for a categorical exception [to the legislative privilege] whenever a constitutional claim directly implicates the government's intent." *Lee v. City of*

*Los Angeles*, 908 F.3d 1175, 1188 (9th Cir. 2018) (noting a categorical "exception would render the privilege 'of little value.' " (quoting *Tenney*, 341 U.S. at 377)).

We also reject LULAC's reliance on cases involving Fifth Amendment equal protection challenges to voting laws as intentionally *racially* discriminatory. *See, e.g., Harness v. Watson*, 47 F.4th 296 (5th Cir. 2022) (en banc) (per curiam). Voting laws like the disenfranchisement provision added to the Mississippi Constitution are analyzed under "the *Arlington Heights* standard," which applies to laws "that are facially neutral but have *racially* disproportionate effects." *Id.* at 303 (emphasis added). Under that "standard, '[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.' " *Id.* at 303–04 (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)).

But there is a distinct difference between claims of intentional discrimination premised on race, a suspect class for Fifth Amendment purposes, and those premised on political viewpoint. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021) ("The spark for the debate over mail-in voting may well have been provided by one Senator's enflamed partisanship, but partisan motives are not the same as racial motives."); *Rucho*, 139 S. Ct. at 2502 ("Unlike partisan gerrymandering claims, a racial gerrymandering claim does not ask for a fair share of political power and influence, with all the justiciability conundrums that entails. It asks instead for the elimination of a racial classification. A partisan gerrymandering claim cannot ask for the elimination of partisanship."). Thus, intentional discrimination involving a suspect class does not provide the proper framework, either.

We believe the district court should have applied the balancing approach set out by the United States Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, and *Burdick v. Takushi*, 504 U.S. 428, to determine whether the requested

documents are relevant to LULAC's constitutional claims. The underlying premise of LULAC's lawsuit challenges the election laws as burdening their members' individual rights to vote by making the voting process more difficult and less accessible. Whether premised on free speech or equal protection, challenges to voting regulations as burdening individual voters' access to the polls are more properly considered based on the severity of the burden under the *Anderson-Burdick* balancing approach. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204 (2008) (Scalia, J., concurring in judgment) ("To evaluate a law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process—we use the approach set out in [*Burdick*]."); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 344 (1995) (describing *Anderson* and *Burdick* as cases where the Court "reviewed election code provisions governing the voting process itself"); *Daunt v. Benson*, 956 F.3d 396, 406–07 (6th Cir. 2020) ("The *Anderson-Burdick* test may apply to First Amendment claims as well as to Equal Protection claims."). We adopted the *Anderson-Burdick* framework in recent voting rights challenges under the Iowa Constitution. *Democratic Senatorial Campaign Committee v. Pate* involved a dispute over an emergency election directive issued by the secretary of state concerning the dissemination of absentee ballot request forms leading up to the November 2020 general election during the COVID-19 pandemic. 950 N.W.2d 1, 2–3, 6–7 (Iowa 2020) (per curiam). We employed the *Anderson-Burdick* balancing test to reject the plaintiffs' claim that the revised procedures impermissibly burdened voting rights in violation of article II, section 1 of the Iowa Constitution, as well as the due process and equal protection clauses of the Iowa Constitution. *Id.* at 6–7 (putting the claims "in perspective" and concluding the burden of providing a few additional items of personal identification on the request form was not so great to "forc[e] us to rewrite Iowa's election laws less than a month

before the election"). We again used the balancing test in *League of United Latin American Citizens of Iowa v. Pate* to reject a requested temporary injunction to block enforcement of a recently enacted election law that limited how county auditors could correct defective absentee ballot requests. 950 N.W.2d 204, 209 (Iowa 2020) (per curiam) (concluding the state's interest in ensuring the person completing an absentee request form is in fact the registered voter supported the changed procedure). We believe this framework provides the correct analysis for LULAC's constitutional challenges here.

The *Anderson-Burdick* test applies to challenges to "generally-applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself." *Anderson,* 460 U.S. at 788 n.9. This is a flexible standard that balances "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* at 789. In *Burdick,* the United States Supreme Court succinctly explained the balancing test as follows:

> Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions.

*See Burdick v. Takushi,* 504 U.S. 428, 434 (1992) (citation omitted) (first quoting *Norman v. Reed,* 502 U.S. 279, 289 (1992); then quoting *Anderson,* 460 U.S. at 788).

Under the *Anderson-Burdick* framework, legislative intent is not part of the court's analysis. Rather, courts employ an "analytical process comparable to that used by courts 'in ordinary litigation,' " *McIntyre*, 514 U.S. at 345 (quoting *Anderson*, 460 U.S. at 789), by weighing the state's interests against the respective interests of injured voters and assessing the extent to which the contested voting restrictions are justified by the state's interests, *id.* Thus, even if a voting restriction is found to be severe and subject to a higher level of scrutiny under the balancing test, it is the state's regulatory interest—not the individual legislator's intent—that determines whether the restriction violates voters' constitutional rights.

At this stage of the litigation, the intent of individual legislators has little, if any, relevance to LULAC's claims. *See Crawford*, 553 U.S. at 203–04 (majority opinion) ("[I]f a nondiscriminatory law is supported by valid neutral justifications, those justifications should not be disregarded simply because partisan interests may have provided one motivation for the votes of individual legislators. The state interests identified as justifications for SEA 483 are both neutral and sufficiently strong to require us to reject petitioners' facial attack on the statute."). Unless and until a showing is made that that framework should be supplanted, the communications LULAC seeks by subpoena from the Legislators will not further its underlying claims, and there is no reason to abrogate the legislative privilege in this case, even if we determined it to be a qualified privilege. *Cf. Bethune-Hill*, 114 F. Supp. 3d at 337 (abrogating the common law legislative privilege afforded state legislators was "particularly appropriate" in redistricting litigation where "legislative intent is specifically contemplated as part of the resolution of the core issue" involved).

**IV. Conclusion.**

We reverse the district court's judgment granting in part LULAC's motion to compel and remand with instructions to quash the subpoenas.

**PETITION FOR WRIT OF CERTIORARI GRANTED; WRIT SUSTAINED.**